# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

MARCOS ESQUIVEL BARRERA,

Defendant and Appellant.

S103358

Los Angeles County Superior Court
PA029724

June 1, 2026

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Groban, and Jenkins[*] concurred.

Justice Liu filed a concurring opinion.

Justice Evans filed a dissenting opinion.

---

[*]     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BARRERA

S103358


Opinion of the Court by Kruger, J.


A jury convicted defendant Marcos Esquivel Barrera of the first degree murders of two of his children, five-year-old Ernesto and two-year-old Guadalupe, and found true the special circumstances of torture murder and multiple murders. (Pen. Code, §§ 187, 190.2, subd. (a)(3), (18).) The jury also convicted Barrera of child abuse homicide, child endangerment, and corporal injury to a child, and found true additional enhancement allegations concerning the latter two offenses. (Pen. Code, §§ 273ab, 273a, subd. (a), 273d, subd. (a), 12022.7, subd. (a), 12022.95.) After the penalty phase, the jury returned a verdict of death. The trial court sentenced Barrera to death on the murder counts and stayed punishment on the other counts. This appeal is automatic. (*Id.*, § 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

The prosecution presented evidence that, at the time of the murders, Barrera maintained two families: a family of seven children with his wife, Petra Ricardo, and a family of four children with Petra's younger sister, Maria Ricardo, who was

Barrera's codefendant in this case.[1]  Barrera and Maria Ricardo lived together with nine of the children in the Pacoima neighborhood in Los Angeles, while Petra and the other children lived in a different place nearby.

Barrera had married Petra in Mexico in 1980.  About five years into his marriage, Barrera took Maria Ricardo with him to the United States, leaving Petra in Mexico.  Maria Ricardo, who was 14 or 15 at the time, testified that Barrera took her to the United States against her will and physically abused her. Barrera and Maria Ricardo began to have children of their own. The move created two families, one on each side of the border. Maria Ricardo and her children lived in California, while Petra and her children stayed in Mexico.  Barrera lived with Maria Ricardo in a converted garage with one living space, a bathroom, and a kitchen.

For a time, Barrera lived with Maria and her children and traveled back and forth between the two families.  In 1997, Barrera brought Petra and her children to the United States. Petra and her children moved into a different place in Pacoima, near the converted garage where Barrera and Maria Ricardo lived.  Barrera decided, against Petra's wishes, that five of Petra's children would move into the converted garage where he and Maria Ricardo lived.  These five children included Guadalupe (known as Lupita) and Ernesto.  Lupita lived with Barrera for about three months before her death at age two;

---

[1]    Maria Ricardo was charged with crimes including child abuse and acting as an accessory to the crimes of murder and child abuse homicide.  She was found guilty of two counts of child abuse (Pen. Code § 273a, subd. (a)), but not guilty as an accessory (*id.*, § 32).

Ernesto lived with Barrera for about nine months before his death at age five.

The prosecution presented evidence that Barrera physically abused members of both family households. Barrera's daughter, Maria E., testified that when Barrera got angry, he would pull her hair until it came out or hit her with his leather shoes. He would also hit Petra's 13-year-old twins, Jose E. and Marcos E., with his shoes or thick belt. Another daughter, Luz E., testified that Barrera beat all of them, and that he beat her mother, Maria Ricardo, "almost every day" with cords, coat hangers, shoes, broomsticks, and "anything that he could grab." Barrera would sometimes take Maria Ricardo to the mountains for beatings, occasionally with the children in tow. On one occasion, Luz tried to intervene as Barrera punched her mother; Barrera threw a shoe at Luz and gave her a bloody nose. Maria Ricardo testified that Barrera would beat her for perceived disobedience, including, for example, going outdoors on a hot summer day when he had commanded her to stay indoors.

The prosecution also presented evidence that Barrera controlled the family's activities, including where his family members would sleep, eat, and work. The family supported itself by selling corn, and Barrera ordered the children to help with selling, sometimes following them in his car as they pushed carts of corn down the street. Barrera collected the earnings at the end of each day and Maria E. testified he would sometimes get angry if he felt the funds fell short. According to Maria Ricardo, when Barrera was upset with her, she "always had to kneel" and beg for forgiveness. Barrera had also threatened

Maria Ricardo in the past, telling her she "did not deserve to keep on living."

While he was abusive toward both families, witnesses testified that Barrera favored Maria Ricardo's children over the children of his wife, Petra. Luz testified that Barrera used to say that his children with Maria Ricardo were his favorites. He would demonstrate occasional kindness towards Maria Ricardo's children — for instance, buying them a birthday cake — that he did not demonstrate to Petra's children. Petra's oldest daughter, Maria E., testified that her half-siblings "had more than [she] did."

Witnesses testified that Barrera targeted Lupita and Ernesto, who were both Petra's children, for particularly severe abuse. According to Maria Ricardo, Barrera began beating Lupita and Ernesto immediately after the two arrived at the converted garage. When asked whether Barrera ever gave a reason for abusing Lupita and Ernesto, witnesses testified that Barrera said Lupita was disobedient and "did not love him," and that Barrera did not believe Ernesto was his biological son. Luz explained this was because Ernesto "was light" and had light brown hair.

Maria E. and her brother Jose both testified that Barrera beat Lupita "every day." Maria E. testified he would beat Lupita "with his hands, and [that] he used to throw [Lupita] into the wall," which he did more than once. Maria E. also testified that Lupita had marks on her that were "red" and "[o]n her back, on her front," though she could not remember whether Lupita had those marks all of the time, nor whether Barrera ever hit Lupita with his shoe or a belt.

On the day of her death, two-year-old Lupita woke up crying. Maria E. testified that Lupita had "gone to the bathroom in her underwear." When Barrera found out, he told Maria E. to give Lupita a cold shower. Maria E. tried to use warm water instead, but Barrera entered the room, ordered the tap turned to cold, and put Lupita in the cold shower. After the cold shower, Barrera took Lupita to the middle of the living area, clasped her wrist, pulled her arm up straight into the air, and "started hitting her" in the back with his flat hand at least three times. Lupita was crying. Maria E. testified that Lupita's head flopped back and forth, "going down, up and down, up and down" as far back as possible. Barrera then threw Lupita into a wall about eight feet away.

Lupita's head hit the wall with a loud crack. According to Maria E., Lupita's "neck went down," she fell to the ground, and she made no more noise. At this point, Maria Ricardo told Barrera to stop hitting Lupita because "he was going to kill her," but Barrera told Maria Ricardo to "shut up." He commanded Lupita to "put her head up," then asked Maria E. to try holding Lupita's head up. Maria E. tried, but Lupita's head kept "falling down." Barrera cursed and twice commanded Lupita to "stand up, you bitch." Maria Ricardo and Barrera then tried unsuccessfully to revive Lupita by putting alcohol under her nose.

Maria Ricardo accused Barrera of killing Lupita. She testified that she told Barrera they should call the police or take Lupita to the doctor, but Barrera refused because Lupita "was beaten and there would be investigations and they would remove all the children." Barrera told Maria Ricardo and Maria E. not to tell anyone what had happened. At this point, Lupita

was unconscious but still breathing. She was left on the floor for several hours. While Lupita was on the floor, Barrera left the converted garage to deliver corn to Petra to sell.

Jose testified that sometime that afternoon, Barrera returned from Petra's house and instructed him to take the blame for Lupita's injury or else he would "do the same thing [to me] as to my sister." Barrera then drove Jose, some of the other children, and Lupita — who was then still breathing — to Petra's house. Jose told his mother, Petra, that he accidentally threw Lupita into the wall when he meant to throw her onto the bed. When Petra saw Lupita, she began to cry. She testified that Lupita was "stressed," "very cold," and that she saw a belt mark on Lupita's leg as well as a cut. She wanted to take Lupita to the hospital, but Barrera again refused, saying they could not afford a hospital visit and that Jose would get into trouble. Instead, Barrera took Petra and several of the children to buy Pedialyte and Tylenol. Petra tried to give Lupita the Tylenol, but she was unable to take it. According to Petra, during this time, Barrera did "nothing," kept saying "[i]t was just an accident, woman," and called Petra a "scandalous fucking bitch." Lupita died in Petra's arms later that night.

After Lupita's death, Petra wanted to take the child's body to a funeral home, but Barrera refused. Instead, Barrera bought a pick, a shovel, and a bottle of acid. Taking Lupita's body with him, he brought several family members to nearby mountains, instructed one of the children to dig, and poured acid on Lupita's body after she was placed into the hole. Her body was discovered about eight months after she was buried. A crucifix had been placed on her chest.

6

The prosecution introduced expert testimony from Dr. James Ribe, who examined Lupita's body. Dr. Ribe found evidence of hydrochloric and sulfuric acid on her body, which he said complicated the exam by, for example, softening her bones and causing certain parts of her skeleton to collapse. Nonetheless, Dr. Ribe testified to several findings from the autopsy. Based in part on an incision into Lupita's skull, Dr. Ribe found bruising inside the skull bone indicating intentional blunt force trauma. In Dr. Ribe's opinion, the bleeding also had to be caused by an adult because a two-year-old could not produce the amount of force required to generate that level of bruising. Lupita also had a "diastatic fracture" to her skull, likewise consistent with blunt force trauma. She had bruising on her back and neck which were "suspicious" of a hemorrhage and had likely been sustained within a week of death, though the acid made closer examination difficult. Dr. Ribe stated an injury like this would be painful, but whether such pain was prolonged depended on how long the child remained conscious. He also stated that such an injury "usually . . . cause[s] instantaneous unconsciousness," but he did not know whether it did so in this case. Dr. Ribe also explained that he took x-rays of Lupita's body and sent them to a radiologist, Dr. Donald Boger, who found healed or partially healed fractures in Lupita's arm, collarbone, and both femurs. Dr. Ribe independently examined Lupita's right femur and found evidence of a weeks to months-old fracture. He opined there was no way the fracture could have been caused accidentally, "not in a two-year old or one-year old, which when this happened she was probably only one-year old or in that range. A baby like that is barely even walking." He believed the injury was "intentionally done" and would have been "painful for some period of time." He did not

7

independently examine the other three fractures, but believed they were also intentionally caused: "When you have small fractures on a child like that; one leg, you can believe, but three or four fractures cannot be an accident." Dr. Ribe acknowledged, however, that the x-rays only "suggest[ed] the changes seen with healing fractures"; it was "not definite" that what they revealed were, in fact, healing fractures. Dr. Ribe also found evidence of chronic neglect and malnutrition. Although Lupita was two years old, she was the same size as a typical 18-month-old. Based on the size and overall condition of her body, and accounting for postmortem deterioration, Dr. Ribe estimated Lupita had been chronically neglected and undernourished for at least six months to one year before her death. Dr. Ribe concluded Lupita "was definitely abused by an adult" and that she suffered from battered child syndrome, having sustained "repeated injuries over a period of time giving injuries of different ages."

During the same period, Barrera continued to abuse Ernesto. The abuse temporarily subsided after Lupita's death but resumed weeks later. Maria E. and Jose both testified that Barrera beat Ernesto "every day," using not just his hands, but also a wide belt, the belt buckle, leather shoes, a broomstick, and "whatever he could find." Barrera would tell Ernesto to lift his arms and then hit his back, and he would hit the broomstick against Ernesto's feet and legs; he broke Ernesto's legs at least once. Barrera also beat Ernesto with an electrical cord. Maria E. saw red marks and bruises "basically everywhere" on Ernesto, "in the back, in the front, on his feet." At one point, Ernesto could no longer use both of his legs and had to hop on one foot. When that happened, Barrera tied sticks, boards, and some floor tile to Ernesto's leg possibly as a makeshift splint,

though the details are not entirely clear. Jose's twin brother, Marcos, testified that Barrera tied up Ernesto's wrists and ankles, and that Ernesto would be tied all day and night on the floor of the kitchen. Luz remembered only Ernesto's hands being tied up all day.

The prosecution also presented evidence that Barrera isolated Ernesto from the rest of the family. Maria E. testified that Barrera made Ernesto eat "[b]y the wall," even though the other children could eat wherever they wanted. Ernesto was sometimes fed last. Marcos remembered Ernesto being hungry, and two of the children testified that Barrera would sometimes instruct family members to withhold food from Ernesto. At some point, Ernesto had to ask Barrera's permission to eat. Barrera also dictated where Ernesto would sleep, assigning him to a spot away from the rest of the family. According to Jose, Maria Ricardo's children slept on the bed, Petra's children slept on the carpet, and Ernesto had to sleep "separate, over by the door." One child also testified that Ernesto's job was to pick up trash, which Barrera made him continue even when his leg was in the makeshift splint.

At some point, Ernesto appeared to fall into a semi-comatose state. Barrera placed him upright against a wall of the garage, where Ernesto stayed all day, barely eating or drinking. According to Jose, Ernesto remained in this state — up against the wall with his head leaning forward — for about two months. The children would give Ernesto food or water by raising his head. Jose testified that one night, as Maria E. was attempting to feed Ernesto, Ernesto "didn't want to anymore." Barrera tried to force Ernesto to eat by alternately hitting Ernesto, kicking Ernesto with his foot, and "grabb[ing] [Ernesto]

9

by the hair" and yanking his head back. Barrera then punched Ernesto three times in the chest and kicked him in the head, knocking Ernesto's head back into the wall. Jose heard a loud noise when Ernesto's head hit the wall, and Ernesto's body shook a little as he dropped to the floor. Ernesto stopped moving. Maria Ricardo heard Barrera say to Ernesto, " 'Don't fall asleep, fatso. Don't fall asleep.' " Barrera also commented that Ernesto was dying. Barrera and the rest of the family then went to sleep, leaving Ernesto on the floor where he had fallen. Ernesto died sometime during the following 24 hours.

After Ernesto died, Barrera asked Maria E. to see whether Ernesto's body was cold. Barrera then brought the boy's body to Petra and told her that the boy had fallen — that he "had an accident . . . like a cardiac arrest." Petra asked Barrera why Ernesto was "really thin" and said he "wasn't like that" before. She remembered seeing a bruise on his body.

The next evening, Barrera took Ernesto's body and drove several family members into the Angeles National Forest north of Pacoima. That night, two Los Angeles deputies out on patrol in the National Forest spotted an abandoned car on the side of the road. They pulled over to investigate and found Barrera, Maria Ricardo, and three of the children in a brush area off the road. Maria Ricardo was lying on a shovel next to some loose dirt. After taking the shovel and digging about a foot and a half into the earth, one of the deputies uncovered a piece of blue cloth; when he pulled on the cloth, Ernesto's arm came along with it. The officers called the homicide unit, and Ernesto's body was exhumed shortly after. Like Lupita, Ernesto had been buried with a crucifix. One of the children later told investigating detectives where Lupita was buried.

Prosecution experts testified that Ernesto's body exhibited evidence of physical abuse and severe neglect and malnutrition. Dr. David Whiteman, who performed Ernesto's autopsy, described Ernesto's injuries as a "textbook case for child abuse."[2] Ernesto's body was bruised, malnourished, and covered with lesions and scars, including scars consistent with painful injury caused by intentional whippings with some kind of cord or rope. There were also marks suggesting that something had been tied around Ernesto's right leg, consistent with tiles tied around his leg as a splint, as well as a line consistent with a ligature mark on Ernesto's neck. Some of these marks and bruises were fresh and occurred within hours of Ernesto's death; others were older than six months. Ernesto was found wearing a diaper as underwear. Dr. Whiteman opined that the injuries, taken together, revealed a "complete constellation of intent": there were so many large, differently aged wounds that they pointed to "an intentional beating over a long period of time."

According to Dr. Whiteman, Ernesto also had 20 broken bones: 13 rib fractures (including some rebreaks), four lower leg fractures (both bones in each leg), an upper arm fracture, and two fractures in his forearms. Dr. Whiteman stated that the rib fractures had occurred at different times and that the amount of force necessary to break Ernesto's ribs would have required "intentional compression." The rib fractures would have made it "extremely painful" for Ernesto to breathe. Dr. Whiteman believed a fracture to Ernesto's left tibia, which occurred within a week of Ernesto's death, was "most likely" an intentional

---

[2] According to Dr. Whiteman, the list of injuries to Ernesto's skin and internal tissue occupied two and a half single-spaced pages, and there were too many injuries to fit into one diagram.

break, given the other injuries Ernesto had sustained. A fracture to the left fibula, meanwhile, was at least a few weeks old but less than a year old, and the right leg had an old fracture that had never been adequately splinted or otherwise allowed to heal correctly. Ernesto's "feet and legs were chronically deformed from repeated fractures" that never healed correctly, meaning Ernesto would not have been able to walk normally. Dr. Whiteman also described two blood clots found in Ernesto's skull, one old and one recent, both likely caused by intentional blows to the head.

Dr. Whiteman also found evidence that Ernesto was "deliberately starved." Ernesto's ribs and bones were visible through his skin, his hair was thinning, and he was missing his thymus — a gland in the chest that disappears in children with a history of chronic starvation. Dr. Whiteman believed Ernesto had been malnourished for at least six months and that he was not being fed during the period before his death. Ernesto's weakened state also made it more difficult for Dr. Whiteman to assess the force required to cause some of the boy's injuries.

Based on the number of injuries to Ernesto's body and the boy's weakened state, Dr. Whiteman concluded Ernesto suffered from battered child's syndrome, which occurs when a child is so "injured over a long period of time, and it's a continuum of injuries, [that] you cannot pick out the effect of one single injury." In his view, Ernesto's injuries had been intentionally caused. The injuries were so extensive that Ernesto would have died "from the constellation of injuries" even without the hematoma in the brain. Dr. Whiteman testified he had never seen a case of child abuse like Ernesto's in his entire career.

The defense put on no witnesses. Barrera conceded that he was guilty of second degree murder, but "of no more than second-degree murder."

The prosecutor argued, and Barrera's jury was instructed on, two theories of first degree murder: (1) murder by torture and (2) premeditated and deliberate murder. Without specifying which theory or theories it relied on, the jury convicted Barrera of first degree murder for the deaths of both Ernesto and Lupita. (Pen. Code, § 187, subd. (a).) As to both murders, the jury also found true both the torture-murder and multiple-murder special circumstances. (See Pen. Code, § 190.2, subd. (a)(3), (18).) The jury also convicted Barrera of assault of a child under eight resulting in death (an offense sometimes called child abuse homicide), child endangerment, and corporal injury to a child; and the jury found true additional enhancement allegations concerning the latter two offenses. (Pen. Code, §§ 273ab [child abuse homicide], 273a, subd. (a) [child endangerment], 273d, subd. (a) [corporal injury], 12022.7, subd. (a), 12022.95.)

## B. Penalty Phase

The prosecution presented testimony from four of Barrera's children. Each described their feelings of hatred and fear towards their father and sense of loss from Ernesto's and Lupita's deaths. They also described additional acts of violence and abuse committed by Barrera. Edilberto E., Barrera's oldest child with Petra, testified that Barrera once threw him to the ground and tried to choke him. Barrera also forced Edilberto, who was about 16 years old at the time, to bury Lupita, and Edilberto saw Barrera pour acid on her body. Edilberto also testified that Barrera beat Petra with "whatever was at hand,"

13

including when Petra was pregnant. Luz testified that she hated her father, and that when she was living with Barrera, she "didn't know what was right and what was wrong." She "felt nothing" when she saw Ernesto lying unconscious against the wall, and though she was initially scared when she heard Lupita's head hit the wall, "after, [she] felt the same"; events like these seemed like the "normal state of affairs." Juan E., one of Petra's sons, was 10 years old at the time of trial. He testified that Barrera used to hit him with a belt; Edilberto had also testified that Barrera would beat Juan with "whatever was at hand." Juan still had dreams that his father was "trying to kill [him]." The prosecution also introduced a letter from eight-year-old Guadalupe E., one of Maria Ricardo's sons, after the child had trouble recounting the letter on the stand. In the letter, Guadalupe repeatedly described his fear of facing his father. Guadalupe also testified that Barrera would beat him with a belt and possibly a shoe.

The defense presented evidence concerning Barrera's childhood. Barrera's parents testified that Barrera grew up on a "ranchito" growing corn, and that the family lacked electricity, plumbing, or a car. Barrera began working around 13 years old, stopped attending school, and later moved to Mexico City to work. He married Petra when he was 18 years old. Barrera's father and aunt both testified that the family was embarrassed when Barrera later took Maria Ricardo to the United States and left Petra behind but also testified that Barrera would send Petra money. When asked whether Barrera was abused as a child, both Barrera's father and uncle said no.

The defense also presented the testimony of a cultural expert, Professor Felipe Peralta, who described risk factors that

might have put Barrera under stress, increasing the likelihood that he would abuse his children: Barrera married at a young age, lacked legal status in the United States, had no friends, was isolated from his family in Mexico, had an uncertain economic situation, and maintained two households with a large number of children.

Following the presentation of evidence, the jury returned a verdict of death, and the trial court entered judgment accordingly.

## II. GUILT PHASE ISSUES

### A. Sufficiency of the Evidence

As noted, the prosecution presented, and the jury was instructed on, two theories of first degree murder for the deaths of Ernesto and Lupita: torture murder and premeditated and deliberate murder. The jury returned guilty verdicts without specifying which theory or theories it had relied on. It also found true the torture-murder special-circumstance allegation as to both murders. On appeal, Barrera concedes the evidence was sufficient to convict him of the second degree murders of the two victims, but he challenges the sufficiency of the evidence as to his first degree murder convictions on either theory, as well as to the true findings on the torture-murder special circumstance.

In reviewing a challenge to the sufficiency of the evidence, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944 (*Powell*).) We " 'presume[] in support of the judgment the existence of every fact the trier could

reasonably deduce from the evidence.' " [Citation.] The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings." (*Ibid.*)

Applying these well-settled standards, we conclude that the evidence sufficed to sustain Barrera's convictions for first degree murder on both a theory of torture-murder and premeditated and deliberate murder, as well as the jury findings on the torture-murder special circumstance.

### 1. *Murder by Torture and Torture-murder Special Circumstance*

" ' "All murder which is perpetrated by means of . . . torture . . . is murder of the first degree. " ' " (*Powell, supra*, 5 Cal.5th at p. 944, quoting Pen. Code, § 189, subd. (a).) " 'Murder by torture requires (1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent.' " (*Powell*, at p. 944.) Murder by torture "does not require an intent to kill, but requires the intent to torture, and requires the same proof of deliberation and premeditation as is required of other kinds of first degree murders." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 (*Whisenhunt*), citing *People v. Steger* (1976) 16 Cal.3d 539, 546 (*Steger*).) The prosecution need not prove that the victim suffered pain. (*People v. Lopez* (2018) 5 Cal.5th 339, 356 (*Lopez*), citing *People v. Edwards* (2013) 57 Cal.4th 658, 716 (*Edwards*).) The torture-murder special circumstance likewise requires the intent to torture, but not "a premeditated and

deliberate intent to torture." (*Edwards*, at p. 718; see Pen. Code, § 190.2, subd. (a)(18)).) It also requires the " 'infliction of an extremely painful act upon a living victim' " and the intent to kill. (*Edwards*, at p. 718.) It does not require "a causal relationship between the torturous act and death [citation], or proof the victim subjectively experienced pain." (*Ibid.*)

In challenging the first degree murder convictions and torture-murder special-circumstance finding, Barrera disputes only the evidence supporting his intent to torture — and specifically, that the evidence supported his willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. " 'The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' " (*Lopez*, *supra*, 5 Cal.5th at p. 356, quoting *People v. Streeter* (2012) 54 Cal.4th 205, 237 (*Streeter*).) We have "cautioned against giving undue weight to the severity of the wounds" (*People v. Chatman* (2006) 38 Cal.4th 344, 390 (*Chatman*)), but we have recognized that evidence " 'the defendant intentionally inflicted nonlethal wounds' " may help demonstrate an intent to torture, as such wounds " 'evidence[] deliberate and gratuitous violence beyond that which was necessary to kill the victim' " (*Powell*, *supra*, 5 Cal.5th at p. 945.) We also consider " 'the totality of the brutal acts and the circumstances which led to the victim's death. . . . [It is not] whether any single act by itself caused the death; rather, it is the continuum of sadistic violence that constitutes the torture.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643 (*Jennings*), citations omitted, quoting *People v. Proctor* (1994) 4 Cal.4th 499, 530–531 (*Proctor*).) With these

principles in mind, we turn to the evidence concerning each of Barrera's victims.

### a. *Lupita*

The evidence at trial showed Lupita was repeatedly beaten in the months preceding her death at age two. Two of Barrera's children testified that Barrera hit Lupita "every day," and one said Barrera had thrown Lupita into the wall more than once. Another child testified Barrera hit Lupita and Ernesto more than anyone else. Family members recalled seeing marks all over Lupita's body, and Lupita's mother, Petra, testified she saw a cut and a belt mark on the child's leg on the day that Lupita died. The evidence of a "long course of painful abuse" supports an inference that Barrera harbored an intent to torture. (*People v. Gonzales* (2011) 51 Cal.4th 894, 942 (*Veronica Gonzales*); accord, *Lopez*, *supra*, 5 Cal.5th at p. 359 [evidence of repeated bruising leading to numerous injuries sufficed, among other things, to establish intent to torture].)

In addition to the evidence of continuous physical abuse, medical testimony showed Lupita was abnormally small for her age and about six months behind in development, which indicated that she, like Ernesto, was malnourished. As Barrera emphasizes, the evidence did show that the family faced poverty, and none of the trial witnesses testified that Barrera deliberately withheld food from Lupita, as opposed to from Ernesto. But based on the evidence concerning Barrera's considerable control over his family, as well as the extensive evidence that Barrera had withheld food from another disfavored child, a jury could reasonably infer that Barrera bore responsibility for Lupita's malnourished condition. This, too, supported an inference of torturous intent. (Cf. *Jennings*, *supra*,

50 Cal.4th at p. 645 [victim's young age, underdeveloped weight, and "chronic and acute physical abuse" relevant to establish torturous intent].)

Evidence concerning the murder likewise supports an inference that Barrera harbored the requisite intent. The prosecution presented evidence that on the day Lupita died, Barrera beat the child after she wet the bed. He ordered Lupita be given a cold shower, taking it upon himself to turn the tap back to cold after Maria E. tried to bathe Lupita in warm water instead. Barrera then beat Lupita, holding her arm up with one hand and hitting her in the back with the other as she cried and her head flopped back and forth. The evidence shows he then threw her into the wall about eight feet away, resulting in an audible crack; twice told the child to "stand up, you bitch" when she was unresponsive; and refused to take her to a hospital or seek appropriate medical care, even though she continued to breathe for hours after the fall.

As Barrera points out, there was evidence that he attempted to revive Lupita after her initial fall and later bought her Tylenol and Pedialyte when she was still breathing. But this evidence does not negate the reasonable inferences the jury could draw about Barrera's state of mind from the remainder of the evidence concerning his extreme abuse of Lupita. A reasonable jury could have viewed these ineffectual actions as stemming from a self-interested attempt to keep Lupita alive and avoid discovery of his crimes, rather than a genuine effort to seek appropriate treatment of the child. Barrera refused to take Lupita to a hospital because, according to Maria Ricardo, the child "was beaten and there would be investigations." And he thereafter refused to take Lupita to a funeral home after she

19

died, instead burying her secretly in the mountains and pouring acid on her body.

Finally, the jury heard that Barrera had a motive for his harmful actions toward Lupita: that Lupita was disobedient and did not love him. Motive is relevant in assessing a defendant's state of mind as to torture (see *Lopez*, *supra*, 5 Cal.5th at p. 356; *People v. Daugherty* (1953) 40 Cal.2d 876, 886; *People v. Cole* (2004) 33 Cal.4th 1158, 1214 (*Cole*); *Streeter*, *supra*, 54 Cal.4th at p. 245), and a jury could reasonably have considered such evidence.

The evidence is, in sum, sufficient to show Barrera's willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on Lupita for a sadistic purpose. (Cf., e.g., *Lopez*, *supra*, 5 Cal.5th at p. 356 [continued abuse when the defendant was reasonably aware that victim was in pain supported inference of intent to torture]; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1274 (*Ivan Gonzales*) [failure to seek timely help for child victim despite visible signs of suffering supported intent to torture]; *Veronica Gonzales*, *supra*, 51 Cal.4th at pp. 941–942 [same].) Barrera's repeated insistence that Lupita may have experienced "instantaneous unconsciousness" after her head hit the wall does not compel a contrary conclusion, as murder by torture does not require proof that the victim suffered pain. (*Lopez*, at p. 356.)

Barrera contends that this case is controlled by *Steger*, *supra*, 16 Cal.3d 539. In *Steger*, three-year-old Kristen died from head injuries and suffered from multiple cuts, bruises, fractures, and internal injuries that had been sustained at different points in time. (*Id.* at p. 543.) This court concluded that the evidence of multiple beatings did not establish the

defendant's "cold-blooded intent to inflict extreme and prolonged pain," but instead revealed the defendant as "a tormented woman, continually frustrated by her inability to control her stepchild's behavior," who beat Kristen in "several distinct 'explosions of violence.'" (*Id.* at p. 548.)

We are not persuaded by Barrera's reliance on *Steger*. The jury in this case heard evidence not only that Barrera beat Lupita over a prolonged period of time, but also evidence from which they could have concluded that Barrera deliberately starved her, resulting in substantial developmental delays; evidence of Barrera's callous behavior toward Lupita both before and after delivering the fatal blow, including evidence that he told Lupita to "stand up, you bitch," when she was unresponsive; evidence that he left her on the ground for hours after her fall; and evidence that he refused to take her to a hospital or seek appropriate medical care. The jury was not bound to interpret Barrera's behavior toward Lupita as merely the product of a series of uncontrolled fits of rage. (See *Lopez*, *supra*, 5 Cal.5th 339, 356 [distinguishing *Steger* and concluding the evidence of repeated bruising leading to numerous injuries sufficed, among other things, to establish intent to torture].)

Our conclusion that the evidence was sufficient to support the jury's finding of intent to torture Lupita applies equally to the first degree murder conviction and to the torture-murder special circumstance. It is unclear whether Barrera means to challenge the sufficiency of the evidence to support the jury's special circumstance finding that he intended to kill Lupita. But such a claim lacks merit in any event. The trial evidence showed that after a prolonged period of abuse, and knowing Lupita was in a weakened state, Barrera threw her into a wall with

sufficient force to render her unconscious. (Cf. *Lopez*, *supra*, 5 Cal.5th at p. 355.) Barrera then refused to seek appropriate medical help and left Lupita on the ground for hours, continuing to refuse to seek appropriate help until Lupita died in Petra's arms. By "failing to get help, [Barrera] ensured [Lupita's] death. The evidence of intent to kill was sufficient." (*Veronica Gonzales*, *supra*, 51 Cal.4th at p. 942.)

### b. *Ernesto*

The evidence established that Barrera repeatedly beat Ernesto over a prolonged period of time, leading to what the forensic examiner described as a "constellation" of painful injuries consistent with this history of intentional abuse. Multiple family members testified that Barrera beat Ernesto every day, either hitting, punching, or kicking the boy or striking him with a belt, electrical cord, or broomstick. Jose testified that Barrera whipped Ernesto with an electrical cord and beat Ernesto's legs with a broomstick, at one point breaking Ernesto's legs. The examiner found injuries to Ernesto's body and legs that were consistent with these injuries. Multiple children testified Ernesto had been tied up for some period of time, and that floor tiles may have been tied to his legs; the examiner found "linear markings" and an ulcer that was consistent with this description.

The evidence also showed that Ernesto eventually fell into a semi-comatose state and had been left in that state for about two months before Barrera kicked his head into the wall, ultimately killing the child. Jose described the fatal kick to Ernesto's head, and the examiner found intracranial bleeding in Ernesto's skull that was consistent with Jose's account. The medical examiner testified that Ernesto had 20 broken bones,

including fractures to his ribs that would have made it "extremely painful" for the child to breathe.  A reasonable jury could conclude, based on this evidence, that Barrera intended to, and did, torture Ernesto.  (*Veronica Gonzales*, *supra*, 51 Cal.4th at p. 942 ["The long course of painful abuse suffered by [child victim] suggested that defendant . . . *habitually* tortured her"]; *Whisenhunt*, *supra*, 44 Cal.4th at p. 201 [evidence of repeated beatings, including "brutal[]" kicks and punches, as well as additional abuse after the victim was already incapacitated supported inference of intent to torture]; *Powell*, *supra*, 5 Cal.5th at p. 945 [evidence of intentional infliction of nonlethal wounds can support inference of torture]; *Proctor*, *supra*, 4 Cal.4th at p. 532 [evidence of physical abuse after victim "rendered incapable of avoiding further attack" also supports inference of torture].)

The evidence also indicated Barrera singled Ernesto out for gratuitous punishment.  Though the other children could eat and sleep where they wanted, Ernesto had to sleep "separate, over by the door."  In addition, two of Barrera's children testified that Barrera would sometimes withhold food from Ernesto, and Petra stated Ernesto was "really thin" at the time of his death, and that he "wasn't like that" before.  These observations matched the forensic examiner's testimony about the state of Ernesto's body: his ribs were visible through his skin, his hair was thinning, and he was missing his thymus, signs suggesting that the boy had been "deliberately starved."  These pieces of evidence, too, supported a finding of intent to torture.  (See *Ivan Gonzales*, *supra*, 54 Cal.4th at p. 1247 [child torture-murder victim could not sleep or eat with the other children]; *Jennings*, *supra*, 50 Cal.4th at p. 642 [evidence of "physical violence and

23

deliberate starvation" of child victim supported conviction for first degree murder by torture].)

The evidence further indicated that Barrera made no effort to seek help for Ernesto's injuries. When Ernesto's legs were broken, Ernesto did not receive medical attention but instead had sticks and floor tiles tied to his leg as a makeshift splint; again, Dr. Whiteman found injuries consistent with this account. During the two months Ernesto was in a semi-comatose state, Barrera never made any effort to aid the child as he lay on the floor unmoving. Instead, when the boy would not eat, Barrera violently grabbed Ernesto's hair, attempted to pull his head back, and eventually kicked him in the head, killing him; as Ernesto slumped to the ground, Barrera made no effort to assist him or get medical help, remarking only that the boy was "dying." Barrera and the rest of the family then went to sleep.

A jury could reasonably infer from this pattern of conduct that Barrera harbored a willful, deliberate, and premeditated intent to inflict cruel suffering on Ernesto. In *Lopez*, *supra*, 5 Cal.5th 339, we found the evidence sufficient to sustain a conviction for torture murder where the child victim had bruises all over her body, the medical evidence established she was " 'repetitively exposed to multiple episodes of blunt trauma, with pain being associated with each one,' " and the child's cries could be heard from the next door unit, a fact that supported the inference that the defendant "was aware that the child was in pain." (*Id.* at p. 356; see *id.* at p. 345.) Similarly here, eyewitness and medical evidence showed that Ernesto was repeatedly beaten in painful ways, and that the child's cries were heard by multiple family members living in the household.

The evidence also showed that Ernesto suffered visibly painful injuries of which Barrera could not have been unaware. According to the medical examiner, Ernesto's "feet and legs were chronically deformed from repeated fractures," which would have prevented the boy from walking correctly. Ernesto was also visibly emaciated and covered with lesions, scars, bruises, and injuries. Eventually, Ernesto fell into a semi-comatose state and was unable to eat, drink, or keep his head up.[3] He was in that state when Barrera inflicted the fatal blows.

As was true of Lupita, trial testimony also tended to show that Barrera had a motive to single Ernesto out for special abuse; indeed, Barrera particularly disfavored Ernesto because he believed that Ernesto was not his biological son. And much as in the case of Lupita, after inflicting the fatal blows, Barrera made no attempt to get help for Ernesto; instead, commenting that Ernesto was "dying," Barrera went to sleep. From this evidence, too, the jury could infer Barrera's intent to torture Ernesto. (See *Veronica Gonzales*, *supra*, 51 Cal.4th at p. 942 [evidence that defendant "witnessed the extreme and prolonged pain that ensued as [child victim] lay dying, and did nothing to secure assistance until her body began to stiffen" supported

---

[3]     On appeal, Barrera suggests that the prosecution failed to show he was responsible for all of Ernesto's injuries. As an example, he identifies a single break to Ernesto's arm that Petra testified had been sustained in Mexico before Ernesto began living with Barrera. But Petra's testimony suggests Barrera was also responsible for this particular injury. And in any event, the prosecution was not required to show Barrera was responsible for every injury. Barrera concedes he engaged in a pattern of abuse, and the jury was entitled to draw reasonable inferences from the evidence that Barrera repeatedly beat Ernesto and the child suffered severe injuries as a result.

inference of intent to torture]; *Ivan Gonzales*, *supra*, 54 Cal.4th at p. 1274 [same].)

Again, Barrera fails to persuade that the jury was obligated to view his actions toward Ernesto as the product of an uncontrollable burst of rage or as a "misguided . . . attempt at discipline." (*Steger*, *supra*, 16 Cal.3d at p. 548.) The evidence also established Ernesto had been systematically starved and maltreated, not just occasionally beaten: he was visibly emaciated, singled out for particularly severe abuse, forced to sleep and eat apart from the other children, and left in a semi-comatose state for months, during which time Barrera continued to abuse him. It was not unreasonable, given the facts presented, for the jury to infer that Barrera's abuse was the result of a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for a sadistic purpose, and not merely an isolated violent outburst.

This conclusion about the sufficiency of the evidence supporting the torture-murder conviction concerning Ernesto applies equally to Barrera's challenge to the sufficiency of the evidence supporting the intent to torture element of the torture-murder special circumstance. (See *Lopez*, *supra*, 5 Cal.5th at p. 357 [evidence supporting intent to torture for first degree torture-murder also suffices to support intent to torture for torture-murder special circumstance]; *Proctor*, *supra*, 4 Cal.4th at p. 531 [same].) Substantial evidence also supports the inference that Barrera harbored the requisite intent to kill. Barrera notes that he does not concede this point, but neither does he present any argument to the contrary. This is unsurprising: The trial testimony established that Barrera commented Ernesto was "dying" after Barrera kicked his head

into the wall and the boy fell to the ground, but nonetheless did nothing to secure medical assistance and instead went to sleep. "By failing to get help, [Barrera] ensured [Ernesto's] death. The evidence of intent to kill was sufficient." (*Veronica Gonzales*, *supra*, 51 Cal.4th at p. 942.)

### 2. *Premeditated and Deliberate Murder*

Barrera next contends the evidence was insufficient to support a finding of premeditation and deliberation necessary to support the first degree murder convictions on a theory of premeditated and deliberate murder.

" 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*Lopez, supra*, 5 Cal.5th at pp. 354–355, quoting *People v. Stitely* (2005) 35 Cal.4th 514, 543.) "[T]he intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought." (*Whisenhunt, supra*, 44 Cal.4th at p. 201.) "The reflection may be arrived at quickly; it need not span a specific or extended period of time." (*Lopez*, at p. 355.) "We have found planning activity, preexisting motive, and manner of killing to be relevant, although these factors do not ' "exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." ' " (*Ibid.*)

We conclude that the evidence is sufficient to support findings of premeditation and deliberation with respect to both victims.

### a. *Lupita*

As previously explained, the evidence here showed that Barrera physically abused Lupita for months. The jury could

27

also infer Barrera intentionally starved Lupita, leaving her approximately six months behind in development. Witnesses also testified Barrera beat Lupita and Ernesto more than his other children, and that he thought Lupita was disobedient and did not love him.

On the day Lupita died, Barrera repeatedly hit the two-year-old child with his hand and eventually threw her eight feet into the wall, resulting in an audible crack and rendering her unconscious. Though several witnesses testified that Lupita was still breathing after her fall, Barrera left her on the ground for hours and refused to seek appropriate medical care.

A reasonable jury could conclude Barrera's actions showed a premeditated and deliberate intent to kill Lupita. The facts of this case are comparable to those of *Lopez*, *supra*, 5 Cal.5th 339, in which we found the evidence sufficient to sustain a first degree premeditated and deliberate murder conviction. We explained that "[a] deliberate intention to kill is supported by the fact that [the victim] Ashley was a small toddler, already weakened by several days of extreme abuse, when Lopez lifted her over his head and threw her to the ground. Lopez personally inflicted the injuries on Ashley that caused her weakened state, which placed him in a heightened sense of awareness of her fragility, further supporting a finding of premeditation in the act of harming her." (*Id.* at p. 355.) "From this evidence of Lopez's escalating acts of abuse and conscious efforts to conceal his actions and prevent Ashley from receiving needed medical attention, a reasonable jury could conclude Lopez intentionally killed Ashley with preexisting thought and reflection." (*Id.* at pp. 355–356.) Precisely the same is true here. As in *Lopez*, we find the evidence was sufficient to sustain a conclusion that

Barrera was responsible for the first degree premeditated and deliberate murder of Lupita.

### b. *Ernesto*

As with Lupita, the evidence showed Barrera physically abused Ernesto for months. In addition, the evidence tended to show Barrera deliberately starved Ernesto. This maltreatment resulted in severe injuries that left the boy in a semi-comatose state, during which period the child could not eat, drink, or lift his head on his own. While Ernesto was in this weakened state, Barrera never sought medical attention but instead left Ernesto lying immobile against the wall for two months until he died. When Ernesto reached the point where he was either unable or unwilling to eat, Barrera grabbed the child's hair, tried to force him to eat, punched him several times in the chest, and then kicked his head into the wall, causing the boy to collapse to the floor and eventually die. After Ernesto fell, Barrera commented that the boy was "dying." He then went to sleep. Witnesses also testified that Barrera believed Ernesto was not his biological son.

A reasonable jury could conclude Barrera's actions showed a premeditated and deliberate intent to kill Ernesto. Again, much as in *Lopez,* the victim was a child already weakened by considerable abuse when Barrera delivered the blow that killed him. (*Lopez, supra*, 5 Cal.5th at p. 355.) Here, Barrera repeatedly punched and then kicked a severely weakened five-year-old child in the head — a child whose condition was due to Barrera's own abuse, giving Barrera heightened awareness of the child's fragile state. When Ernesto fell to the ground, Barrera observed that the boy was "dying" yet did nothing to help. (Cf. *id.* at pp. 355–356 [efforts to prevent child victim from

receiving medical attention supported inference of premeditated intent to kill]; *Whisenhunt, supra*, 44 Cal.4th at p. 202 [same].) Barrera also believed Ernesto was not his biological son, "suggesting a motive to harm the child." (*Lopez*, at p. 355.) His "continuing and escalating acts of abuse caused [Ernesto] prolonged pain," further supporting a finding of premeditated intent to kill. (*Ibid.*; see *Whisenhunt*, at pp. 201–202 ["continuing and escalating acts of abuse showed [defendant's] premeditated and deliberate intent" to kill]).

Finally, we note that defendant committed fatal acts against *both* Lupita and Ernesto, just months apart. As we have previously explained, " 'the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 815.) Furthermore, the jury heard evidence that after Lupita's death, Barrera temporarily ceased abusing Ernesto, only to resume the abuse after a matter of weeks. A reasonable jury could infer that this break in abuse between Lupita's and Ernesto's deaths reflects volitional control, and in turn conclude that Barrera's harmful acts were deliberate and premeditated rather than the product of rash impulse.

We are not persuaded to reach a different conclusion by Barrera's criticism of the prosecutor's arguments to the jury. Barrera contends the prosecutor made "conclusory statements" about Barrera's state of mind and invited the jury to draw the wrong inferences from the facts in evidence concerning his treatment of Lupita and Ernesto. At the threshold, the focus of

these arguments is misplaced. In a sufficiency challenge, our inquiry on review is whether the evidence was sufficient for a reasonable jury to reach its verdict, not the arguments of counsel. (*Powell, supra,* 5 Cal.5th at p. 944.) But in any case, for the reasons already explained, the jury could reasonably infer from the facts cited by the prosecutor that Barrera intended to kill both victims and that he did so with premeditation and deliberation.

## B. Admission of Statements by Non-Testifying Expert

Barrera argues that portions of the trial testimony by Dr. Ribe, the medical examiner who carried out Lupita's autopsy, conveyed case-specific testimonial hearsay in violation of both state evidence law and the confrontation clause of the federal Constitution. (See *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 (*Crawford*).) Specifically, Barrera contends that portions of the testimony were improperly drawn from a report by Dr. Donald Boger, a radiologist who did not testify at trial. Dr. Boger's report, which was reprinted in Dr. Ribe's autopsy report, was also admitted into evidence; Barrera argues the admission of the report, too, violated state evidence law and the confrontation clause.

We assume, without deciding, that Dr. Boger's findings were admitted in violation of the confrontation clause and state hearsay law. We conclude, however, that any error was harmless beyond a reasonable doubt.

### 1. Factual Background

Barrera's trial took place in 2001. As noted, Dr. James Ribe, a senior deputy medical examiner with the Los Angeles

County Department of the Coroner, performed an autopsy on Lupita's body after her remains were discovered. He testified at trial about his findings. At the outset, he explained that he had difficulty completing a full autopsy due to the "natural decomposition" of the body after eight months, as well as "chemical deterioration" from the hydrochloric and sulfuric acid that had been poured on her body at the time of burial. According to Dr. Ribe, the acid was most present in Lupita's skeleton, back, left side of her head, and the left shoulder areas, and had apparently "soaked into her body" from the ground up, "kind of pooled in the left upper body area," and eventually "affected the entire body as far down as the knees, or a little below." The acid complicated the examination because it softened Lupita's bones, giving them the "texture of wet cardboard." That softening effect, when combined with the weight of the soil under which Lupita was buried, caused parts of her skeleton to flatten and collapse, including her rib cage, spine, and pelvis. Lupita was also missing her internal organs; her brain had become some sort of "pasty material"; and her skin was "badly faded." Dr. Ribe believed there must have been a "fair amount" of acid poured onto Lupita's body to create that level of deterioration.

Much of Dr. Ribe's testimony — including his testimony regarding Lupita's skull injuries, bruising, and malnourishment — was based on his own observations during the autopsy. Dr. Ribe also, however, took several X-rays and sent them to a radiology consultant, Dr. Boger, who did not testify at trial. Dr. Ribe's testimony at trial included statements that either quoted or directly referenced Dr. Boger's radiology report.

Dr. Ribe testified that his own examination revealed evidence of a diastatic fracture to Lupita's skull. When asked to relate his findings regarding "other breaks" to Lupita's bones, Dr. Ribe stated: "I took X-rays, and I had them referred to our radiology expert consultant. And he found evidence of healed or partially healed fractures in the right humerus, which is the right upper arm bone, the right collarbone, and both femurs which are the thigh bones." Dr. Ribe conducted his own analysis on Lupita's right femur, examining part of the bone under a microscope. Dr. Ribe explained that postmortem deterioration complicated the examination because the coating of Lupita's bone, which is "what we really want to look at to evaluate a fracture," was completely gone. Nonetheless, based on the state of the "inner bone" in Lupita's right femur, Dr. Ribe found evidence of a completely healed fracture that would have been "weeks to months old." Dr. Ribe also testified that given Lupita's young age — "[a] baby like that is barely even walking" — the fracture would have had to be intentional, and would have been "painful for some period of time."

Dr. Ribe attributed findings concerning the three other possible fractures to "the radiologist," and Dr. Ribe confirmed that he did not separately examine them. Asked if any of these three fractures could be dated, Dr. Ribe again quoted from Dr. Boger's report: "[Dr. Boger] describes them as changes which also suggest 'changes seen with healing fractures.' He doesn't say how much healing because he can't tell, so we're talking about things that are weeks or up to about six weeks old, if you call it healing." When the prosecutor asked, "So possibly six weeks old up to six weeks old?" Dr. Ribe said, "That would fit with the wording that [Dr. Boger] has used . . . ." Dr. Ribe also testified that, in his opinion, the additional fractures would not

have been accidental: "When you have small fractures on a child like that; one leg, you can believe, but three or four fractures cannot be an accident."

Dr. Ribe opined that the state of the Lupita's body was consistent with a finding of battered child syndrome, meaning "repeated injuries over a period of time giving injuries of different ages." He also testified that, based on Lupita's height and size, she was about six months behind on her growth, evidence consistent with malnourishment and chronic neglect.

During cross-examination, Barrera's attorney confirmed that Dr. Ribe examined only one of the fractures himself, and that the fracture Dr. Ribe examined took place "a month to a year, or even more" before Lupita's death. Barrera's attorney also asked Dr. Ribe about the nature of the other three fractures: "Are they actually indented fractures, or are they simply thickening of the bone on the X-ray?" Dr. Ribe responded, "More of the latter. They are thickening of the bone on the X-ray which have an abnormal appearance and what the radiologist felt suggest the changes seen with healing fractures." When Barrera's attorney responded, "well, suggest is not exactly saying it's a fracture, is it?," Dr. Ribe responded: "That's right. It's not definite."

Dr. Ribe's report, which reprinted Dr. Boger's two-page radiology report in full, was admitted into evidence along with other prosecution exhibits. Barrera did not object to the admission of Dr. Boger's report, although he did object to other items of evidence, including parts of Dr. Whiteman's report regarding the autopsy of Ernesto. The court overruled Barrera's objection to Dr. Whiteman's report, concluding that the challenged pages of the report were admissible under the

hearsay exceptions for business or official records. (Evid. Code, §§ 1271, 1280.)

### 2. *Legal Background*

State evidence law generally forbids the admission of hearsay evidence unless it satisfies a statutory exception. (*People v. Turner* (2020) 10 Cal.5th 786, 821 (*Turner*), citing Evid. Code, § 1200, subd. (b).) A statement is hearsay if it was made by an out-of-court declarant and was "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)

At the time of Barrera's trial, courts generally took the view that an expert could testify to case-specific out-of-court statements not for the truth of the matter, but for the nonhearsay purpose of explaining the basis for the expert's opinion. (*Sanchez, supra*, 63 Cal. 4th at pp. 680–681, 683–684 discussing *People v. Gardeley* (1996) 14 Cal.4th 605.) In our 2016 decision in *Sanchez, supra*, 63 Cal.4th 665, we rejected this view. We explained: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Id.* at p. 686.) Though an expert can still "*rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so" (*id.* at p. 685), an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception" (*id.* at p. 686).

The federal Constitution likewise places limits on the admission of case-specific hearsay through expert testimony. The confrontation clause of the Sixth Amendment provides a

criminal defendant the "right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) At the time of Barrera's 2001 trial, United States Supreme Court precedent had held that "the admission of hearsay did not violate the right to confrontation if it bore 'adequate "indicia of reliability." ' " (*Sanchez*, *supra*, 63 Cal.4th at p. 680.) Overruling this precedent, the court in its 2004 *Crawford* decision interpreted the confrontation clause to forbid the admission of "testimonial" hearsay unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. (*Sanchez*, at p. 680.)

In *Sanchez*, explaining the import of *Crawford* to expert testimony conveying out-of-court-statements, we articulated the law as follows: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. . . . If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez*, *supra*, 63 Cal.4th at p. 686; accord, *Smith v. Arizona* (2024) 602 U.S. 779, 802–803.)

### 3. *Analysis*

Barrera argues that Dr. Ribe's testimony conveying Dr. Boger's radiology findings, as well as Dr. Boger's report itself, constituted case-specific hearsay and thus was admitted in violation of *Sanchez*. He further argues that the hearsay was testimonial hearsay and thus should not have been admitted

36

under *Crawford* absent an opportunity to cross-examine the declarant.

Barrera's claim based on state evidence law confronts a threshold difficulty. We have held that because *Sanchez* expressly changed existing hearsay law, a defendant's failure to object to expert testimony relating case-specific hearsay was not forfeited in cases tried before *Sanchez*. (*People v. Perez* (2020) 9 Cal.5th 1, 9, citing *Edwards*, *supra*, 57 Cal.4th at p. 705.) But this is not a case, like *Sanchez* or *Perez*, in which a nontestifying expert's out-of-court statements were conveyed solely through the testimony of a testifying expert, on a "not-for-truth" rationale. Here, the challenged statements — Dr. Boger's written report — had already been admitted into evidence, as part of Dr. Ribe's report. Thus, although Dr. Ribe's testimony conveyed case-specific hearsay, one might say that the points he conveyed were "independently proven" by evidence in the record. (*Sanchez*, *supra*, 63 Cal.4th at p. 686.) Barrera could have objected to the admission of Dr. Boger's report, much as he had objected to the admission of parts of Dr. Whiteman's report concerning his autopsy of Ernesto. (Overruling the objection, the trial court held the challenged parts of Dr. Whiteman's autopsy report admissible either as a business record or an official record.) But Barrera did not object *either* to Dr. Ribe's testimony about Dr. Boger's findings *or* to the admission into evidence of the portion of Dr. Ribe's report that reprinted Dr. Boger's two-page radiology report.

The parties debate at length whether Barrera's failure to object to the admission of Dr. Boger's written report amounted to a forfeiture of his current *Sanchez* claims. There is, however, no question that Barrera has a nonforfeited claim that the

admission of Dr. Boger's findings amounted to constitutional error. We have held that a claim of *Crawford* error based on the admission of any evidence — whether in the form of witness testimony or documentary evidence — is not forfeited by a defendant's failure to object at a trial that occurred before *Crawford* was decided, because *Crawford* dramatically changed the law governing the admissibility of both types of evidence. (*People v. Leon* (2015) 61 Cal.4th 569, 602; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1215.) Because Barrera's trial occurred several years before *Crawford* was decided, he has not forfeited the claim. For reasons we will explain, our resolution of Barrera's *Crawford* claim makes it unnecessary for us to decide whether Barrera has adequately preserved a claim under *Sanchez* as well.

Again, under *Crawford*, *supra*, 541 U.S. 36, the federal Constitution bars the admission of testimonial hearsay unless the declarant is unavailable to testify, and the defendant has had a prior opportunity to cross-examine the declarant. (*Id.* at p. 68.) The high court in *Crawford* declined, however, to provide a comprehensive definition of the term "testimonial." (*Ibid.*) And while both the United States Supreme Court and this court have since addressed numerous questions concerning the scope of the term, "[t]he question of whether and when statements in technical reports qualify as 'testimonial hearsay' remains an evolving area of the law." (*People v. Gonzalez* (2021) 12 Cal.5th 367, 398.) Our cases applying *Crawford* to technical reports by a nontestifying witness have generated numerous separate opinions, and we have recently observed that " 'considerable flux" [continues to] surround[ ] the high court's Sixth Amendment jurisprudence." (*People v. Schultz* (2020) 10 Cal.5th 623, 660, fn. 8).

But even if we assume that the introduction of Dr. Boger's report violated the confrontation clause, any error was harmless beyond a reasonable doubt.  (See *People v. Gonzalez*, *supra*, 12 Cal.5th at pp. 398–399 [setting out the applicable standard for evaluating error].)  Careful review of the record shows no reasonable possibility the admission of those materials contributed to Barrera's conviction.

Dr. Boger's report, and Dr. Ribe's testimony about the report, were introduced to demonstrate that Lupita's death was part of a pattern of abuse and suffering rather than the result of an isolated incident of extreme violence.  Based on his own investigation, Dr. Ribe found evidence of intentional blunt force trauma to the head — including internal bleeding in the skull, contusions to the head, and a skull fracture — which was consistent with family members' accounts of how Lupita died.  Dr. Ribe also found independent evidence of a week- to months-old fracture in Lupita's right femur, which had to be intentional and would have been painful for at least some period of time.  The challenged portions of the evidence, derived from Dr. Boger's analysis, suggested three additional healed or partially healed fractures located in Lupita's upper arm, collarbone, and left femur.

Medical evidence indicating that Lupita's body had three possible healing fractures, in addition to the fracture Dr. Ribe had independently identified, helped to show that Lupita was repeatedly physically abused over a period of time.  But the jury was already well aware of that pattern of severe abuse, having heard the unchallenged testimony of multiple family members who witnessed the beatings firsthand.  From those family members, the jury heard that Barrera beat Lupita daily during

the period when Lupita lived with Barrera, between ages one and two; that he had thrown her into the wall on more than one occasion; and that she had marks all over her body, including a cut and a belt mark on the day she died. The jury also heard detailed testimony describing the charged murder: that Barrera beat Lupita with his hands; threw her eight feet across the room into the wall with sufficient force to cause an audible crack; and refused to get medical attention for several hours while Lupita lay dying. In addition, the jury heard from the same family members that Barrera had engaged in a similar pattern of abuse against Lupita's brother, five-year-old Ernesto, also over a prolonged period of time. Their testimony as to Ernesto was corroborated by the results of Dr. Whiteman's autopsy, which was conducted shortly after Ernesto's death and showed that Ernesto's body was bruised, malnourished, covered with lesions and scars, and that he had multiple broken bones inflicted at different times. Dr. Whiteman testified that the presence of so many severe, differently aged injuries pointed to "an intentional beating over a long period of time." In short, the evidence that Barrera had engaged in a lengthy course of abuse of both children was both overwhelming and undisputed.

Barrera contends that evidence of three additional possible healing fractures was particularly damaging because it illustrated not only the pattern of abuse, but its severity and extent. But the jury already had ample evidence on this issue from the testimony of family members, who described the nature of the abuse and the visible physical marks it left on Lupita; from Dr. Ribe's independent findings concerning the presence of at least one healing fracture on her right femur, which he testified must have been the result of an intentional injury; and from the extensive testimonial and medical evidence of

40

Barrera's severe physical abuse of Lupita's brother Ernesto. The severity of Barrera's abuse of the two child victims was not meaningfully contested at trial; Barrera's primary argument was instead that Lupita's injuries and death were simply the product of an explosive and uncontrollable rage, a mental state consistent only with second degree murder. (Cf. *People v. Leon*, *supra*, 61 Cal.4th at p. 604 [error harmless beyond a reasonable doubt where the cause of death — for which the erroneously admitted report was introduced to prove — was "undisputed" and otherwise not germane to the "central trial dispute"]; *People v. Garton* (2018) 4 Cal.5th 485, 507 [error harmless beyond a reasonable doubt where any improperly admitted testimony went to issues that were not disputed at trial].)

Nor were Dr. Boger's findings a central focus of the prosecution's case. Evidence of the fractures — including both those identified by Dr. Boger and those independently found by Dr. Ribe — were mentioned only twice, both times briefly and once only obliquely, in the prosecutor's closing arguments to the jury; the bulk of the prosecutor's closing arguments instead focused on the family members' extensive accounts of Barrera's abuse of Lupita. (Cf. *People v. Dworak* (2021) 11 Cal.5th 881, 908 [error in admitting statements was harmless where the statements were referenced only twice in closing argument].)

Moreover, the jury had ample reason to regard Dr. Boger's findings with caution, given the state of Lupita's body at the time it was discovered. Unlike Ernesto's body, which was found at the time of burial, Lupita's body had been treated with dissolving acid and left underground for eight months. Dr. Ribe explained to the jury that the combined effect of the acid and decomposition limited his ability to conduct a proper autopsy, in

part because of the deterioration of Lupita's bones. Dr. Ribe also told the jury that the X-ray evidence was not conclusive: When asked about the three additional fractures, Dr. Ribe acknowledged that the X-rays only "suggest[ed] changes seen with healing fractures," and that it was "not definite" that what the X-rays showed were, in fact, fractures. Dr. Boger's report likewise indicated only that there were certain "deformit[ies]" and "sites of increased density" in the X-rays that "suggest changes seen with healing fractures."

These points would not have been lost on the jury, which was reminded multiple times about the state of Lupita's body and the necessarily limited scope of the medical evidence concerning her injuries. During closing arguments, the prosecutor repeatedly contrasted the extensive medical evidence concerning Ernesto with the limited medical evidence concerning Lupita: "[W]ith Ernesto we have a complete coroner's report. We can look at Ernesto and tell exactly what happened. But with Lupita we don't because the defendant poured acid all over her poor little body, and because she was in an unknown, unmarked grave for over eight months. So we don't have the complete picture of Lupita . . . ." The prosecutor later repeated the point in various ways, stating, for example: "As we discussed earlier, Lupita's a little harder to work with, but that's because the defendant . . . destroyed the evidence," "Because of the condition of [Lupita's] body, it's hard to determine [she was intentionally starved] as well as we could with Ernesto," and again, reminding the jury that Lupita's "been in the ground, she'd been dehydrated, and she had acid poured on her."

The prosecutor did state during opening argument that the coroner was a "key to the case on Lupita," but she also

42

qualified that statement by previewing the evidentiary limitations of the coroner's testimony: "Now, true, we can't know exactly what happened to Lupita because Lupita's body has been destroyed in part by acid. So you can't do a complete autopsy. You can't find all the injuries. But the coroner will testify to that." She then went on to state that "[t]he other key, of course, is the children," who were going to provide more specific testimony about the way that Barrera hit his daughter, and the pain Lupita would have experienced (and that Barrera would have been aware of) from those repeated instances of abuse. In closing argument, the prosecutor reiterated the importance of the children's testimony in light of the limitations of Lupita's autopsy: "We'll have to work with what we have, and what we know. What we have is a coroner doing as best an autopsy as he could; and we have the children's testimony; and as I said to you, they've proven reliable. We can believe what they have said."

In sum, the admission of Dr. Boger's findings was harmless beyond a reasonable doubt, given the undisputed testimony from multiple witnesses regarding Barrera's regular beatings and abuse of Lupita, including prior occasions when Barrera had thrown her into the wall; Dr. Ribe's independent findings of injuries, including a healing fracture that he testified must have been intentionally caused; Dr. Ribe's acknowledgment that Dr. Boger's findings about additional possible fractures were not conclusive; and the repeated reminders to the jury about the limitations of the medical examination of Lupita's body given the state in which it was found. Given the other evidence at trial, evidence of the three possible additional fractures described in Dr. Boger's radiology report could have had no meaningful impact on the jury's

assessment of whether Barrera acted with premeditation and deliberation for purposes of the first degree murder verdict or with the torturous intent necessary to sustain the torture-murder findings. We therefore conclude any confrontation clause error in admitting Dr. Boger's statements through Dr. Ribe was harmless beyond a reasonable doubt.

It follows that, to the extent Barrera had preserved his current objection under *Sanchez*, any such error was likewise harmless under the standard applicable to errors of state evidence law: there is no reasonable probability that excluding the challenged findings would have yielded a different result. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## C. Second Degree Felony-Murder Instruction

Barrera argues the trial court should have instructed the jury on second degree felony murder based on torture, as an assertedly lesser included offense of first degree murder by torture. We conclude that any error in failing to give the instruction was harmless in light of both the other instructions given and the evidence presented at trial.

### 1. Background

At the close of guilt phase testimony, the parties met with the trial court to discuss jury instructions. The court reviewed the list of instructions it planned to give, but announced on its own that it would not give a second degree felony-murder instruction because such an instruction would be "confusing" for the jury. The court explained: "Since first-degree murder, based on torture, need not have the intent to kill, but only the intent to torture, for lack of a better term, felony murder/torture would come into play only if the death would be accidental or things of that nature. Otherwise, it would be confusing, and no different

than the first-degree murder, based upon torture. So for that reason, I crossed off felony murder, and will not give that as a theory of second-degree murder, although there are two other theories of second-degree murder that will be given." Barrera's counsel then stated, "That's what I was concerned about." The court responded, "I'll get to that. This is the only theory of second-degree murder that I would be giving." The court continued down the list of instructions it planned to give, reiterating shortly after this exchange that it would be giving the instructions on second degree unpremeditated murder and second degree implied malice murder. Neither the court nor counsel returned to the issue of second degree felony murder by torture. After overruling defense counsel's objections to other instructions, the court asked Barrera's counsel whether he had "any other objection[s]," to which Barrera's counsel replied, "no, there are none." Barrera's counsel also confirmed he had no requests for special instructions.

The jury was instructed on two theories of second degree murder: (1) unpremeditated murder with express malice (under a modified version of CALJIC former No. 8.30), and (2) implied malice murder (CALJIC former No. 8.31). Under the unpremeditated murder theory, the jury was told it had to find Barrera "intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation or murder perpetrated by torture." Under the implied malice murder theory, the jury was instructed, in relevant part, that it had to find "1. The killing resulted from an intentional act, 2. The natural consequences of the act are dangerous to human life, and 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

The jury was not instructed on second degree felony murder based on torture.

### 2. *Analysis*

Although Barrera did not request an instruction on second degree felony murder based on torture, he contends the trial court had an independent obligation to give the instruction. That instruction would have stated: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as the direct causal result of the crime of [torture] is murder of the second degree when the perpetrator had the specific intent to commit that crime." (CALJIC former No. 8.32.) The jury would have also been instructed on the underlying felony of torture: "In order to prove this crime, each of the following elements must be proved: (1) A person inflicted great bodily injury upon the person of another; and (2) The person inflicting the injury did so with the specific intent to cause cruel or extreme pain and suffering . . . for any sadistic purpose." (CALJIC No. 9.90 (6th ed. 1996); see Pen. Code, § 206 [felony torture].)

Barrera's argument rests on certain historical features of the law as it existed at the time of Barrera's crimes. In 1990, the Legislature enacted a statute creating a felony torture offense (Pen. Code, § 206), but it was not until 1999 that the Legislature added torture to the list of predicates for first degree felony murder (*id.*, § 189.) (See *Cole, supra*, 33 Cal.4th 1158, 1219–1220 [describing the relevant statutory background].) Barrera contends that, because his crimes were committed during this intervening period, he could have been convicted of nonstatutory second degree felony murder based on torture. He further contends that the trial court had a sua sponte duty to

instruct on this theory because second degree felony murder based on torture is a lesser included offense of first degree murder by torture, and " '[a] court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so.' " (*People v. Beames* (2007) 40 Cal.4th 907, 926 (*Beames*).)

At the outset, the Attorney General argues Barrera's claim is barred by the invited error doctrine. We disagree. The invited error doctrine holds that a defendant may not complain " ' "when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence." ' " (*Beames*, *supra*, 40 Cal.4th at p. 927; see, e.g., *People v. Hardy* (1992) 2 Cal.4th 86, 185 [defendant may not claim instructional error where counsel's "agreement to the omission of the instructions was 'for tactical reasons and not out of ignorance or mistake' "].) That is not what happened here. The trial court announced on its own that it would not be giving the second degree felony-murder instruction but would instruct on the other two theories of second degree murder. Defense counsel neither requested that the felony-murder instruction be omitted nor signaled any affirmative agreement with the court's decision to omit the instruction.

The Attorney General focuses on defense counsel's response, "That's what I was concerned about." It is, however, unlikely that counsel's statement was intended to signal agreement with the omission of this additional second degree murder instruction, given that the overall aim of the defense was to convince the jury to convict Barrera of second degree murder rather than first degree murder. It is true, of course, that defense counsel did not *challenge* the court's decision to

47

omit a second degree felony-murder instruction. But the record does not indicate that counsel affirmatively agreed to the omission of the instructions, much less that counsel did so for " 'tactical reasons and not out of ignorance or mistake.' " (*Hardy*, *supra*, 2 Cal.4th at p. 185.)

The Attorney General also argues that Barrera forfeited his claim by failing to request a second degree felony-murder instruction at trial. But the Attorney General acknowledges that Barrera's failure to request the instruction would not bar the claim if second degree felony murder by torture was, as Barrera now argues, a lesser included offense of first degree murder by torture during the period from 1990 to 1999. If there was such a lesser included offense, then the trial court had a duty to instruct the jury on it, regardless of whether Barrera requested the instruction. (See, e.g., *Whisenhunt*, *supra*, 44 Cal.4th at p. 217 [defendant does not forfeit instructional challenge for " 'theories of a lesser included offense which find substantial support in the evidence,' " because the court has a "sua sponte duty" to issue all such instructions].)

We have previously considered this issue, but we have not had occasion to resolve it. (See *Beames*, *supra*, 40 Cal.4th at p. 926 & fn. 9; *Cole*, *supra*, 33 Cal.4th at pp. 1219–1220.) Nor do we do so here. As in past cases, we can assume without deciding Barrera's theory that second degree felony murder based on the predicate felony of torture constituted a lesser included offense of first degree murder by torture. Thus, we assume the trial court was required to instruct on the theory if it was supported by substantial evidence, regardless of whether the parties requested it. Barrera's claim of reversible

instructional error nonetheless fails because any error was harmless. (See *Beames*, at pp. 928–929.)

In *Beames*, *supra*, 40 Cal.4th 907, the defendant was convicted of first degree murder, with a jury finding true the special circumstance of torture. At the request of trial counsel, the court declined to give an instruction on second degree felony murder with torture as the underlying felony. (*Id.* at p. 926.) On appeal, the defendant argued the trial court's failure to do so was reversible error. (*Id.* at pp. 926–927.) We concluded counsel invited any error by requesting the instruction not be given. But in any event, and assuming without deciding the merits of the underlying legal theory, we found any error harmless because the jury " ' "necessarily decide[d] the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." ' " (*Id.* at p. 928, quoting *Chatman*, *supra*, 38 Cal.4th at p. 392.) We explained that " '[i]f a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on a felony murder theory.' " (*Beames*, at pp. 928–929.) Here, by finding true the torture-murder special circumstance, the jury "necessarily determined that defendant intended to kill [the victim] when he tortured her. Thus, there was no prejudice resulting from any erroneous failure to instruct on second degree felony murder." (*Id.* at p. 928.)

Our reasoning in *Beames* relied on *People v. Blair* (2005) 36 Cal.4th 686, in which we rejected an identical challenge in the context of murder by poison. We explained there that the jury's true finding on the special circumstance of murder by poison, which required a finding of intent to kill, was

inconsistent with any theory that "defendant intended only to injure [the victim] when he poisoned her," as would be required to sustain a second degree felony-murder conviction. (*Id.* at p. 746; see *id.* at pp. 745–746.) The court's failure to instruct the jury on second degree felony murder by poison was therefore harmless. (*Id.* at p. 747.)

Here, as in *Beames*, the jury returned true findings on the torture-murder special-circumstance allegations, meaning the jury found that Barrera not only tortured both victims, but intended to kill them. It follows from *Beames* that any error in failing to instruct the jury on second degree felony murder was harmless. (*Beames*, *supra*, 40 Cal.4th at p. 928.)

Barrera offers no persuasive reason to revisit our precedent on this point. He argues that *Beames* erred in relying on *Blair* for its harmlessness analysis because *Blair*'s conclusion about the incompatibility of the special circumstance finding and any theory of second degree felony murder depended on specific features of the poisoning crime at issue. But *Beames* effectively held that any theory of second degree felony murder based on torture shares the same relevant features as second degree murder based on poison. Thus, as with second degree murder by poison, second degree felony murder based on torture is negated by the jury's special circumstance finding that the defendant not only intentionally tortured, but intended to kill the victim. (See *Beames*, *supra*, 40 Cal.4th at pp. 928–929.)

In any event, regardless of whether the special circumstance finding alone means the jury *necessarily* would have decided the second degree felony-murder issue adversely to Barrera, Barrera is entitled to reversal only if it is " 'reasonably probable' [he] would have achieved a more

50

favorable result" had the jury been instructed on the theory. (*People v. Breverman* (1998) 19 Cal.4th 142, 149.) We conclude that a more favorable result was not reasonably probable, given the other instructions the jury received in this case. Jurors were instructed on first degree premeditated murder, first degree torture murder, second degree unpremeditated murder with express malice, and second degree implied malice murder. Barrera's central argument appears to be that a second degree felony-murder instruction might have made a difference because it would have allowed the jury to express its judgment that Barrera intentionally tortured both children without having to make additional findings about whether he intended to kill. But if the jury had misgivings about whether Barrera intended to kill his children, they had ample alternatives for expressing that judgment. The jury was instructed on two theories of second degree murder, both of which would have required finding a less culpable state of mind. In returning verdicts for first degree murder and finding true the torture-murder special circumstances, the jury rejected these theories, instead indicating that it believed that Barrera intentionally both tortured and killed his victims and that he committed the torture, the murders, or both, with premeditation and deliberation. We have already detailed the extensive evidence from which the jury could reasonably have inferred that Barrera killed both Lupita and Ernesto with premeditated and deliberate intent. (See pt. II.A.2, *ante*.) Given the evidentiary record and the instructions given, we find no reasonable probability that instructing the jury on a third theory of second degree murder would have changed the outcome.

Barrera argues in the alternative that at the time of his crimes, first degree torture murder and second degree felony

murder based on felony torture were substantively identical, such that he could be only convicted of the lesser crime. (Pen. Code, § 1097.) *Beames* effectively refutes the premise of the argument. (See *Beames, supra*, 40 Cal.4th at pp. 928–929 [assuming the validity of a theory of second degree felony murder based on torture, " '[i]f a jury is not satisfied that a defendant acted with either express or implied malice, it may find the defendant guilty of *second degree* murder on a felony murder theory' "].) Moreover, as we observed in *Veronica Gonzales, supra*, 51 Cal.4th 894, unlike first degree murder by torture, "the second degree offense does not require premeditation." (*Id.* at p. 939; see *Whisenhunt, supra*, 44 Cal.4th at p. 201 [first degree torture murder requires premeditated and deliberate intent to torture, whereas second degree murder does not require any such "preexisting reflection"].)

We therefore reject Barrera's invitation to set aside his first degree murder conviction or reduce the conviction to second degree felony murder based on torture.

### D. CALJIC Former No. 8.71

Barrera also challenges the trial court's instruction on reasonable doubt as to the degree of murder. We have recently rejected several similar challenges. (See *People v. Mataele* (2022) 13 Cal.5th 372, 418–420 (*Mataele*); *People v. Scully* (2021) 11 Cal.5th 542, 596–598; *People v. Potts* (2019) 6 Cal.5th 1012, 1045–1047 (*Potts*); *People v. Mitchell* (2019) 7 Cal.5th 561, 579–582; *People v. Rivera* (2019) 7 Cal.5th 306, 325–327; *People v. Buenrostro* (2018) 6 Cal.5th 367, 428–429 (*Buenrostro*); *People v. Salazar* (2016) 63 Cal.4th 214, 246–248 (*Salazar*); see also *People v. Moore* (2011) 51 Cal.4th 386, 412 [1996 version of

CALJIC No. 8.71 instruction harmless given the jury's true findings of two special circumstances in that case].) For similar reasons, we reject Barrera's argument here.

As an initial matter, the Attorney General argues Barrera forfeited this argument by failing to object at trial. But because Barrera's claim concerns instructional error affecting his substantial rights, we address the merits of the claim. (*Buenrostro, supra,* 6 Cal.5th at p. 428 [reviewing CALJIC No. 8.71 instructional error claim despite lack of an objection]; see Pen. Code, § 1259.)

Barrera's jury received the 1996 version of CALJIC No. 8.71, which stated: "If you are convinced beyond a reasonable doubt, and unanimously agree, that the crime of murder has been committed by the defendant, but you *unanimously* agree you have a reasonable doubt whether the murder was of the first or second degree, you must give defendant the benefit of that doubt, and return a verdict fixing the murder as of the second degree." (Italics added.) According to Barrera, this instruction impermissibly told the jury that even if one juror "was in doubt that the State had met its burden of proving every element of first degree murder, the individual jurors were not obligated to vote for second degree murder, *unless all jurors agreed there was reasonable doubt*. Thus, former CALJIC 8.71 required a juror who had a reasonable doubt about appellant's guilt of first degree murder to nonetheless convict appellant of that crime because another juror disagreed, even though disagreement should lead to no worse outcome than a hung jury."

We have rejected this interpretation of the instruction as "tortured." (*Salazar, supra,* 63 Cal.4th at p. 247.) As we stated in *Salazar,* "[i]f anything, [the 1996 version of CALJIC No. 8.71]

53

skewed the deliberations in [the defendant's] favor. [It] could reasonably be understood to tell the jurors that if they all agreed there was reasonable doubt as to the degree of the crime, because some jurors were not convinced, then defendant was entitled to the benefit of the doubt and a verdict of the lesser offense. No logical reading of the instruction[] leads to a compelled verdict of first degree murder." (*Id.* at p. 247; accord, e.g., *Buenrostro*, *supra*, 6 Cal.5th at p. 429; *Mataele*, *supra*, 13 Cal.5th at p. 420 ["We also rejected the very interpretation advanced by defendant here — that the 1996 revised version of CALJIC No. 8.71 lowered the prosecution's burden of proof by making first degree murder the default verdict"]; *Potts*, *supra*, 6 Cal.5th at p. 1046 ["From that point, the instruction redounded to the benefit of the defendant; uncertainty about the degree of the offense would not make first degree murder the default, it would require that the defendant receive the benefit of the doubt — an acquittal on the first degree murder charge"].)

In any event, Barrera's jury also received a number of other instructions that, when viewed as a whole, adequately conveyed to the jury that each juror "must be individually convinced of defendant's guilt beyond a reasonable doubt before convicting [the defendant] of first degree murder." (*Buenrostro*, *supra*, 6 Cal.5th at p. 429; see *Salazar, supra*, 63 Cal.4th at p. 248 [we evaluate the " ' "correctness of jury instructions . . . from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction' " '].) These included CALJIC former No. 8.74 (jury must unanimously agree as to degree of murder if it finds

Barrera guilty of murder);[4] CALJIC former No. 17.40 (each juror must reach a decision individually and not just follow the group or another juror);[5] and CALJIC former No. 17.43 (during deliberations, the jury should direct any requests or questions to the trial court),[6] as well as the elements of unpremeditated second degree murder (CALJIC former No. 8.30). This combination of instructions sufficed to clarify any confusion caused by CALJIC former No. 8.71. (*Buenrostro*, at pp. 429–430.)  Viewing the instructions as a whole, "[a]ny jurors who

---

[4]    CALJIC former No. 8.74 read in full:  "Before you may return a verdict in this case, you must also agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must unanimously agree as to whether he is guilty of murder of the first degree, or murder of the second degree."

[5]    CALJIC former No. 17.40 read in full:  "The People and the defendant are entitled to the individual opinion of each juror.  [¶]  Each of you must consider the evidence for the purpose of reaching a verdict if you can do so.  Each of you should decide the case for yourself only after discussing the evidence and the instructions with the other jurors.  [¶]  Do not hesitate to change an opinion if you are convinced it is wrong.  However, do not decide any question in a particular way because a majority of jurors, or any of them, favor that decision.  [¶]  Do not decide any issue in this case by the flip of a coin, or any other chance determination."

[6]    CALJIC former No. 17.43 read in full:  "During deliberations, any question or request the jury may have should be addressed to the court on a form that will be provided.  Please understand that counsel must first be contacted before a response can be formulated.  If a readback of testimony is requested, the reporter shall delete objections, rulings, and side-bar conferences so that you will hear only the evidence that was actually presented.  Please understand that it may take time to provide a response.  Continue deliberating until you are called back into the courtroom."

might personally have been persuaded to give defendant the benefit of the doubt regarding the degree of murder when other jurors had concluded [defendant] was guilty of first degree murder would have understood that they could *not* properly vote to convict her of first degree murder because, in their view, the prosecution had not proven her guilt of that offense beyond a reasonable doubt." (*Id.* at p. 430.)

### E. Child Endangerment and Corporal Injury as Lesser Included Offenses of Child Abuse Homicide

Barrera also contends that his convictions for child endangerment and corporal injury must be reversed because they are lesser included offenses of child abuse homicide. (See Pen. Code, §§ 273ab [child abuse homicide], 273a, subd. (a) [child endangerment], 273d, subd. (a) [corporal injury on a child].) Though a single act or course of conduct can give rise to multiple convictions (see Pen. Code § 954; *People v. Correa* (2012) 54 Cal.4th 331, 337 (*Correa*) ["Section 954 generally permits multiple conviction"]), we have recognized a "judicially created exception to this rule prohibit[ing] multiple convictions based on necessarily included offenses." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) The exception, however, applies only when the convictions arise out of "a single act or course of conduct." (*Ibid.*; see *People v. Ortega* (1998) 19 Cal.4th 686, 699 (*Ortega*) ["[W]hether defendants properly were convicted of both robbery and theft depends upon whether those convictions were based upon the same conduct"].) Here, the jury was presented with evidence that Barrera committed multiple acts of abuse and mistreatment spanning weeks — if not months — before the fatal blows that ultimately killed both children. There is no

bar to Barrera's conviction of multiple offenses based on the multiple acts shown at trial.

The crime of child abuse homicide, codified in Penal Code section 273ab, has the following elements: " '(1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death.' " (*People v. Wyatt* (2010) 48 Cal.4th 776, 780; see *ibid.* ["The manifest purpose of section 273ab is 'to protect children at a young age who are particularly vulnerable' "].) The assault element "requires an intentional act and actual knowledge of those facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from the act." (*Id.* at p. 786.) Child endangerment, codified in Penal Code section 273a, subdivision (a), covers " ' "both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." ' " (*People v. Valdez* (2002) 27 Cal.4th 778, 784; *ibid.* [statute intended to protect children from abusive situations with high probability of serious injury].) It applies to anyone who, " 'under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered . . . .' " (*Id.* at p. 783, quoting Pen. Code, § 273a, subd. (a).) And the crime of corporal injury, codified in Penal Code 273d, subdivision (a), makes it a felony to "willfully inflict[] upon a child any cruel or

inhuman corporal punishment or an injury resulting in a traumatic condition."

The evidence supporting Barrera's convictions for child endangerment and corporal injury spanned at least several weeks, and it included multiple nonfatal acts Barrera committed against the children before their deaths. For Ernesto, as explained in part I.A., *ante*, the jury heard evidence that Barrera beat Ernesto every day for months, sometimes using a belt, electrical cord, or broomstick, and that Barrera once broke Ernesto's legs after beating the boy with a broomstick. Barrera also withheld food from Ernesto, and the medical examiner found evidence that Ernesto had been deliberately starved, such as the boy's missing thymus and thinning hair. Ernesto later fell into a semi-comatose state, where he remained for two months before Barrera kicked his head into the wall and killed him. For Lupita, the jury heard evidence that Barrera beat the child every day for about two to three months, and Maria E. testified Barrera had thrown Lupita into the wall more than once. Lupita was malnourished and about six months behind in development. On the day Lupita died, Barrera hit her multiple times and eventually threw her into the wall, killing her. The record thus does not indicate that Barrera's convictions for child endangerment and corporal injury were based on the same fatal blows that killed both children here.

The cases on which Barrera relies in support of his argument are all meaningfully distinguishable. Both cases involve either convictions unquestionably premised on the exact same act (*People v. Reed* (2006) 38 Cal.4th 1224 [three convictions based on single possession of an automatic pistol]),

or a series of acts in rapid succession (*Ortega, supra,* 19 Cal.4th at pp. 689–691 [convictions based on same-day incident where defendants assaulted victims, took wallet and pager, and then entered victim's van and drove away]; see also, e.g., *People v. Sloan* (2007) 42 Cal.4th 110, 114–115, 119 [multiple convictions based on same-day incident where defendant threw his wife to the ground, kicked her, and broke her leg]; *People v. Sanders* (2012) 55 Cal.4th 731, 734 [multiple convictions based on simultaneous possession of two firearms]; *Correa, supra,* 54 Cal.4th at pp. 334–335 [multiple convictions for possessing seven rifles and shotguns].) That is not the case here.

Barrera points to the prosecutor's closing statements — which discussed evidence of beatings alongside the children's death to support the child endangerment and corporal injury charges — as evidence that both convictions were based on the same conduct as the conviction for child abuse homicide. While the prosecutor's statements were not specific in identifying the acts supporting each of the charges, referring more generally to Barrera's "beating" of the children, it is not clear the prosecutor was inviting the jury to return multiple guilty verdicts, involving necessarily included offenses, based solely on the fatal act constituting child abuse homicide.[7] In any event, the

---

[7] For the child endangerment charge, the prosecutor argued in closing: "He beat the hell out of those kids, and he killed them." For corporal injury, she argued: "He beat the kids. They are dead. Pretty easy." For child abuse homicide, the prosecutor argued she had to prove "a lot of the same things I have already proven to you," including that Barrera committed an assault ("this man tortured and beat and battered these children until he finally killed them"); the force was one a reasonable person would know would result in injury ("what do you think a reasonable person thinks when they take a kid that has turned

prosecutor's description of the evidence is not controlling. (See *Ortega, supra*, 19 Cal.4th at p. 699 [review of record indicates robbery conviction was based on act of taking the van, despite prosecution's closing argument basing the robbery charge only on theft of wallet and pager].) The fact remains that the jury heard considerable evidence of Barrera's abuse of the children other than the fatal acts supporting the child abuse homicide charge. We therefore reject Barrera's contention regarding lesser included offenses.

## III. PENALTY PHASE ISSUES

### A. Prosecutor's Comments on Lack of Remorse

"The Fifth Amendment to the United States Constitution provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' " (*Lopez, supra*, 5 Cal.5th at p. 368.) This prohibition " ' "forbids either direct or indirect comment upon the failure of the defendant to take the witness stand,' " ' (*People v. Hughes* (2002) 27 Cal.4th 287, 372), and it applies to both the guilt and penalty phase of capital trials (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1174 (*Zambrano*), citing *Estelle v. Smith* (1981) 451 U.S. 454, 462.) Barrera argues the prosecutor violated his privilege against self-incrimination by alluding to his failure to testify at the penalty phase and

two, that is starved, and not only beat her but pick her up and throw her across the room at that wall. Just like an egg, she splatters on the wall"); and the force resulted in death ("This, ladies and gentlemen, we have proven every which way there is"). The mere fact that the prosecutor described the beatings alongside the deaths does not mean the prosecutor was relying on the exact same conduct for the child endangerment and corporal injury charges as she was for the child abuse homicide charge; instead, it appears the prosecutor was emphasizing the level of force Barrera levied against the victims.

either express remorse or confess guilt. (See *Griffin v. California* (1965) 380 U.S. 609; *People v. Coleman* (1969) 71 Cal.2d 1159.) Upon review of the record, we conclude Barrera has not established a basis for reversal of the penalty.

During the penalty phase, four of Barrera's children testified for the prosecution, describing additional acts of violence from Barrera and their feelings of hatred and fear towards their father. (See pt. I.B., *ante*.) The defense introduced testimony from a cultural expert and from Barrera's relatives in Mexico, including his mother and father, who described Barrera's impoverished upbringing. In her closing argument, the prosecutor referred to Barrera's parents, stating that the defense introduced their testimony as evidence of extenuating circumstances under Penal Code section 190.3, subdivision (k): "[T]hat's why the parents were here. . . . They were here to tell you that [Barrera is] a human being in their mind, and that he's their son, and to feel sorry for him. That's why they're here. Good people. Good people. And he used that most fully." The prosecution then continued:

> Why do I say that? We, the people of the State of California, we the citizens, we don't murder our children. . . . Basic law of nature, we do not torture and murder our children. We don't do it. His parents know that. That's why they are here. And he takes that very notion, the very basic law, and he takes it and *hides behind* it. He violates it, and then *he hides behind it*. That's a blasphemy against nature. How dare he. That's how low he is.

> Does he deserve to live? You weigh that in your mind against what? There's nothing that the

defense can present to you that shows this, I can't say person, shows the defendant has any right to live.

You know we cannot say to you that the absence of remorse is a factor to consider when weighing. But certainly I'm sure that the defense is going to focus on asking for mercy for the defendant. That's why his family was here for mercy.

When you can't talk about remorse, when you talk about whether or not you should give mercy, 'remorse[,]' *have you ever heard anywhere that he's sorry? He doesn't admit any of this. His attorney does.*

Barrera's counsel objected at this point, and the trial judge overruled the objection. The prosecutor then continued, referencing a series of letters Barrera wrote to Maria Ricardo after he was imprisoned:

There is 60 something letters there. In all those letters there is not one word of regret. Unfortunately, all those letters deal with is what he would like to do with Maria [Ricardo], and I'm not going to go into that. But his big concern is whether he can get conjugal visits and describing the kind of sex he's missing with her. . . .

Now, in all these things you have, you have that report of the cultural expert, you have all these letters, there's never any mention of Lupita and Ernesto. There's never any mention of the harm he's done to his other children.

Barrera challenges the italicized portions of the prosecutor's statements, arguing that they impermissibly commented on Barrera's failure to personally admit his crimes by taking the stand. His challenge primarily centers on the prosecutor's statement that Barrera " 'doesn't admit any of this' " but " '[h]is attorney does,' " and that Barrera has not said anywhere "that he's sorry."

As we have previously explained, there is a material difference between "a prosecutor's comment that a defendant failed to take the stand to express remorse and a prosecutor's comment that there was no evidence that a defendant had ever expressed remorse." (*Lopez*, *supra*, 5 Cal.5th at p. 368; see *People v. Hughes*, *supra*, 27 Cal.4th at p. 372 [*Griffin* " ' "does not extend to comments on the state of the evidence" ' "].) When read in context, the prosecutor's rhetorical question to the jury — "Have you ever heard anywhere that he's sorry?" — are not fairly interpreted as statements about Barrera's failure to take the stand, but rather about Barrera's failure to ever express remorse for his actions, including in his letters to Maria Ricardo and in his interview with the cultural expert. (See *Lopez*, at pp. 367, 368 [prosecutor's rhetorical questions — " 'Did you ever hear Mr. or Mrs. Lopez say: Michael Lopez told me, sorry, Mom, for breaking your heart . . . [,] for having you come to court and having you beg for my life.' . . . 'Did you ever hear one word of remorse from him?' " — were permissible because the prosecutor was referring to out-of-court statements, and not defendant's "failure to show remorse to the jury directly by not testifying"]; *Zambrano*, *supra*, 41 Cal.4th at p. 1174 [prosecutor's argument — " 'Is there any evidence that the

defendant has repented or has expressed remorse? [¶] I submit . . . there has been none' " — permissible under *Griffin* because the statements were not that "defendant had failed to *take the stand* to express remorse," but rather, that "there was no *evidence* that defendant had *ever* expressed remorse"].) So understood, there was no error in the comment.

The matter is somewhat less clear as to whether the prosecutor's related comments — that Barrera "doesn't admit any of this. His attorney does" — are also properly considered to be references to the evidence regarding Barrera's lack of remorse. Considered in isolation, the jury might conceivably have understood the remarks to refer to Barrera's failure to personally admit his crimes, especially given the contemporaneous remark that Barrera's attorney was the one making such admissions. These brief comments, however, were sandwiched between a rhetorical question about whether the jury had "ever heard anywhere that [Barrera was sorry]" and a detailed description of Barrera's lack of remorse in letters to Maria Ricardo and in his interview with the cultural expert. Viewed in that context, the prosecutor's comments are perhaps better understood as an inartful way of emphasizing Barrera's lack of remorse in his private communications, despite his attorney's concession at the guilt phase that Barrera killed his children and was guilty of second degree murder. (See *People v. Frye* (1998) 18 Cal.4th 894, 1020 [identifying similar statements as mere references to the "dearth of mitigation evidence" concerning remorse and therefore permissible under *Coleman*].)

But even assuming the comments were improper, the error was harmless, as the comments were "brief and did not overtly call attention" to the defendant's failure to testify or

admit guilt. (*People v. Bloom* (2022) 12 Cal.5th 1008, 1055 (*Bloom*); see *People v. Fierro* (1991) 1 Cal.4th 173, 244 [finding no prejudice in prosecutor's "brief and transitory" remark — which, among other things, stated that defendant committed the charged crimes and " 'for him to stand up now and deny it is the abject opposite of sympathy' " and " 'shows a total lack of remorse' "].)

We also reject Barrera's challenge to the prosecutor's statement that Barrera "hides behind" the "basic law" against murdering one's children. As an initial matter, Barrera has forfeited any challenge to these statements by failing to object to them below. (*People v. Tran* (2022) 13 Cal.5th 1169, 1221.) But even if we were to entertain the claim on the merits, we would find it unavailing. The prosecutor argued that Barrera violated a "basic law of nature" by killing his children; his parents understand this law, which is "why they are here" — presumably, to try to save his life — and Barrera "takes that very notion . . . and hides behind it. He violates it, and then he hides behind it." Barrera argues that these comments impermissibly suggested that he let his parents plead his case instead of taking the stand and asking for mercy himself. We disagree. In context, the prosecutor's comments are most naturally understood as referencing Barrera's decision to have his parents testify in his defense at all — thus effectively asking his parents to shield their child from the consequences of his fatal abuse of his own children — rather than his decision not to testify. We perceive no *Griffin* error in the challenged statement.

Finally, even if the comments had been improper, we would find the error harmless. In view of all the evidence —

including aggravating evidence about Barrera's additional acts of violence, the letters to Maria Ricardo, and the remaining children's testimonies in favor of a death verdict — "[w]e are satisfied beyond a reasonable doubt that the prosecutor's fleeting remark[s] could not have prejudiced" the defendant. (*Bloom*, *supra*, 12 Cal.5th at p. 1055; see *People v. Turner* (2004) 34 Cal.4th 406, 420 [harmless error where, among other things, oblique references to defendant's failure to testify were " 'brief and mild' "].)

### B.  No Adverse Inference Instruction

Barrera also argues that the court erred in refusing to give his requested instruction that the jury make no adverse inferences based on his failure to testify. The jury received this instruction at the guilt phase, but received the standard instruction at the penalty phase to "[d]isregard all other instructions given to you in other phases of this trial."[8]   The court's refusal to give the no-adverse-inference instruction at the penalty phase was error, but we conclude the error was harmless beyond a reasonable doubt.

"[T]he Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." (*Carter v. Kentucky* (1981) 450 U.S. 288, 300 (*Carter*); see *People v. Daveggio & Michaud* (2018) 4 Cal.5th 790, 852.)  This rule extends to the penalty

---

[8]    The jury received CALJIC No. 2.60 at the guilt phase, which provided in full:  "A defendant in a criminal trial has a constitutional right not to be compelled to testify.  You must not draw any inference from the fact that a defendant does not testify.  Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way." (CALJIC No. 2.60 (6th ed. 1996).)

phase of a capital trial. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1424 [in penalty context, "the Fifth Amendment entitles a criminal defendant, upon request, to an instruction that will 'minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify' " (quoting *Carter*, at p. 305)]; *People v. Melton* (1988) 44 Cal.3d 713, 758 (*Melton*).)

In denying Barrera's request, the court relied on *People v. Box* (2000) 23 Cal.4th 1153, but *Box* did not provide authority to support the denial. The relevant discussion in *Box* stated, without further context: "Defendant next contends it was error not to instruct the jury to refrain from drawing any inference from the fact that defendant did not testify at the penalty phase. Not so." (*Id.* at p. 1216.) As support, the *Box* court cited *People v. Davenport* (1995) 11 Cal.4th 1171 (*Davenport*), which also rejected a claim of no-adverse-inference instructional error — but in the context of whether the court had a sua sponte duty to give a no-adverse-inference instruction even if the defendant did not request one. (*Id.* at p. 1231.) *Davenport* did not purport to hold that a trial court can decline a no-adverse-inference instruction if the defendant affirmatively requests one; on the contrary, *Davenport* acknowledged the "general rule" (*ibid.*, citing *Melton*, *supra*, 44 Cal.3d at p. 758) that a no-adverse-inference instruction "need only be given upon his request" (*Melton*, at p. 758). The consistent rule in these cases is that a trial court must give such an instruction upon request but need not do so sua sponte. The court in this case therefore erred in failing to give a no-adverse-inference instruction despite Barrera's request for one.

The parties dispute whether the error here was structural, requiring reversal of Barrera's sentence, or subject to harmless

error review under *Chapman*. Neither we nor the high court has previously decided this question. (See *Carter, supra*, 450 U.S. at p. 304 [declining to address the prejudice standard]; *Burns v. Secretary, Florida Dept. of Corrections* (11th Cir. 2013) 720 F.3d 1296, 1304 ["no opinion by the Supreme Court has answered whether *Carter* error is trial or structural"].) But every California state and federal appellate court to consider the issue has held that *Carter* error is subject to harmlessness review under *Chapman*. (See *People v. Evans* (1998) 62 Cal.App.4th 186, 198 (*Evans*); *U.S. v. Soto* (9th Cir. 2008) 519 F.3d 927, 930 (*per curiam*); *U.S. v. Brand* (1st Cir. 1996) 80 F.3d 560, 568; *Hunter v. Clark* (7th Cir. 1991) 934 F.2d 856, 860; *U.S. v. Ramirez* (5th Cir. 1987) 810 F.2d 1338, 1344; see also *Burns*, at p. 1303 [rejecting habeas corpus petitioner's argument that "failure to give a no-adverse-inference instruction is so fundamental, so structural that reversal would be automatic"]; *U.S. v. Whitten* (2d Cir. 2010) 610 F.3d 168, 200 [applying *Chapman* to *Carter* error].) We now reach the same conclusion.

Our case law makes clear that "most errors implicating a federal constitutional right, including most instructional errors, are amenable to harmless error analysis." (*People v. Aranda* (2012) 55 Cal.4th 342, 363.) As the United States Supreme Court has explained, " 'if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' [Citation.] Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' " (*Neder v. United States* (1999) 527 U.S. 1, 8 [instructional error that omits element of offense is subject to harmless-error analysis]; cf. *ibid.* [structural error includes, for example,

complete denial of counsel, biased trial judge, and racial discrimination in jury selection].) We agree with the weight of authority that *Carter* error does not fall in the limited class of instructional errors warranting automatic reversal without regard to prejudice. Unlike the failure to give a reasonable-doubt instruction, for example, the failure to give a no-adverse-inference instruction is not an error that "always results" in a "fundamentally unfair" trial. (*Weaver v. Massachusetts* (2017) 582 U.S. 286, 296, citing *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; see, e.g., *Evans*, *supra*, 62 Cal.App.4th at pp. 193–194 [citing cases].) "Moreover, a *Carter* instruction is not *required* in every criminal trial; it is merely *available* if a defendant so requests." (*U.S. v. Soto*, *supra*, 519 F.3d at p. 930.) It is not the type of error that " 'affect[s] the framework within which the trial proceeds' " (*ibid.*), nor is it the type of error, like the denial of the right to select one's own attorney, whose effects "are simply too hard to measure" (*Weaver v. Massachusetts*, at p. 295, citing *Vasquez v. Hillery* (1986) 474 U.S. 254, 263). Accordingly, we hold that the erroneous failure to give a no-adverse-inference instruction when the defendant has requested one is, like most constitutional errors, subject to harmless error review under the *Chapman* standard.

In this case, the court's failure to give the no-adverse-inference instruction was harmless beyond a reasonable doubt for the same reasons that any asserted *Griffin* error was harmless: the prosecution presented extensive aggravating evidence about Barrera's additional acts of violence and severe impact on his children. And though the defense attempted to offer a "partial explanation," it also acknowledged "there's a lot we don't have an explanation for." (See pt. I.B., *ante*.) Viewing the record as a whole, there is no reasonable doubt the jury

would have returned the same verdict and made the same findings even if it received a no-adverse-inference instruction.

## IV. OTHER ISSUES

### A. Racial Justice Act Challenges

While the appeal in this case was pending, the Legislature enacted the California Racial Justice Act of 2020 (RJA or Act) (Stats. 2020, ch. 317, § 1), which creates a statutory basis for challenging a conviction or sentence on grounds that it was obtained by means of racial, ethnic, or national origin discrimination. Barrera has raised a number of claims under the RJA. In evaluating these claims, we have considered the parties' arguments concerning the relevant provisions of the RJA as first enacted, as well as subsequent legislative amendments that have taken effect since the appeal in this case was first argued. Based on our review of the trial record, we conclude that Barrera has not established grounds for reversal of his guilt or penalty judgments.

#### 1. Racial Justice Act Background

The central provision of the RJA is Penal Code section 745 (section 745), which declares that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) A defendant may establish a violation by, as relevant here, proving by a preponderance of the evidence that "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language . . . or otherwise exhibited [racial] bias or animus towards the defendant . . . whether or not purposeful." (§ 745, subd. (a)(2).)

70

The statute defines the term " '[r]acially discriminatory language' " to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias,[9] including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).)  In cases in which the judgment was entered before the effective date of the RJA, the use of language that appeals to implicit bias requires reversal unless the People demonstrate the violation was harmless beyond a reasonable doubt. (*People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __ [2026 Lexis ____] [pp. 108–123.] (*Bankston*).)

As the statutory text reflects, RJA claims presented for the first time on appeal may in some cases require additional factual development in the trial court.  But here there is no dispute that the claims Barrera raises can be resolved on appeal based on the existing trial record.  We therefore proceed to consider the merits of Barrera's claims.

### 2.  Pretrial RJA Claims

Barrera claims that three different RJA violations occurred during jury selection at his 2001 trial.  The first alleged

---

[9]   We understand the phrase "racially discriminatory language" and its definition in section 745, subd. (h)(4), in context, to refer not only to bias based on race, but also to bias based on ethnicity or national origin, consistent with the overarching prohibition in subdivision (a).

violation is based on statements made by prospective jurors who were later excused for cause; the second and third alleged violations are based on voir dire questions asked by codefendant's counsel and by his own counsel in order to elicit jurors' potential biases. We conclude that no reversible RJA error occurred.

### a. Statements by Prospective Jurors

During voir dire, two prospective jurors made statements indicating that they would be biased against Barrera based on his nationality and immigration status. Both prospective jurors were excused for cause.

The first prospective juror, R.C., answered yes to the following item on the written juror questionnaire: "A party, attorney, or witness may come from a particular national, racial, or religious group, or has a lifestyle different from your own. Would that fact affect your judgment, or the weight and credibility you would give his or her testimony?" During voir dire, in response to questions from codefendant Maria Ricardo's counsel, Larry Baker, Prospective Juror R.C. explained that "nationality" would affect her credibility judgments. She explained that she "work[s] with Hispanic people; and it's just, sometimes, immigration issues." She said that it was "possible" that the fact that a testifying defendant is Mexican would "play into how [she would] view her evidence [and] testimony." And that it was "possible" that the mere fact that a defendant is Mexican would weigh in to how she would judge her.

The second prospective juror, F.C., wrote in response to the same questionnaire item: "I resent the flood of non-European immigrants to the U.S. in recent years." In an exchange with Baker during voir dire, Prospective Juror F.C.

expanded on the statement. "That was badly put." "What I really meant by that is, I feel sorry for all the people being let in with almost no education, and extremely poor circumstances and background; and I think they tend to become a burden on everyone else, and have no chance of succeeding here. I wish our policies were different."

Although both of these prospective jurors were disqualified from service, Barrera contends that the prospective jurors' statements violate section 745, subdivision (a)(2) (section 745(a)(2)). A violation occurs under that provision when "the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror" uses "racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (*Ibid.*)

We find no violation. The statutory list in section 745(a)(2) includes jurors, but it does not, by its terms, include *prospective* jurors. This is presumably because a prospective juror who is not seated as a juror plays no role in the process of "seek[ing] or obtain[ing] a criminal conviction or . . . sentence." (*Id.*, subd. (a).) Barrera argues that the prospective jurors' statements should nonetheless be treated as RJA violations because they were made in open court and may have influenced other persons who were selected to serve on the jury. But the RJA contains no provision addressing expressions of bias made by persons who play no role in the prosecution or adjudication of a criminal matter, simply because these statements may have been heard by others who do play a role. In any event, there was no meaningful risk that the prospective jurors' confessions of bias

would have encouraged bias in others. In both instances, after making the challenged statements, the prospective jurors were removed for cause, as unqualified to serve. If anything, the process of jury selection would have reinforced the vital message that bias is disqualifying and can play no role whatsoever in the adjudicative process.

### b. *Questioning by Codefendant's Counsel*

Barrera also claims that Baker, who was representing his codefendant, violated the RJA by "singl[ing] out" prospective jurors who appeared to be Latino for additional questioning at voir dire. We agree that counsel's questioning during the voir dire process is not exempt from scrutiny under section 745 (a)(2). A violation is established when "an attorney in the case" — including a defense attorney — uses "racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibit[s] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745(a)(2).) But we find no violation of the RJA in the comments Barrera challenges here.

First, in an exchange with one prospective juror, Baker asked: "Being Hispanic yourself, sir, and seeing that the defendants are each Hispanic, does that anger you one way or another?" The juror replied, "No." Baker then asked, "Does it embarrass you in any way, shape or form?" The juror replied, "Maybe." He responded to a question from the court that he would not be close-minded to anything codefendant Maria Ricardo would offer in testimony. Baker then asked him if he believed he "might have a better insight into cultural considerations here?" to which he replied, "I'd just put that aside, and I'll go with the evidence and all that stuff." Baker

asked a second prospective juror with a common Hispanic surname, "Do you have any feelings about the defendants as you sit here one way or another because they are Hispanic?" Finally, Baker asked a third prospective juror, "I note you have a Hispanic surname, [codefendant Maria Ricardo] is Hispanic herself. [¶] Do you feel somewhat able to prejudge her or have any further insight into her because of a shared heritage?"

Barrera argues that this questioning violated the RJA because it evoked stereotypes "that nonwhite jurors [can] not be trusted to judge a defendant who shares their race." Although we emphatically agree with Barrera that the deployment of racial stereotypes in jury selection can have corrosive effects on the fair administration of justice, we are not persuaded that counsel's conduct here violated defendant's rights under the RJA. In relevant part, the RJA provides that a violation occurs when either (1) a specified person exhibits bias or animus toward the defendant because of the defendant's race, ethnicity, or national origin, or (2) a specified person "use[s] racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant." (§ 745(a)(2).) " 'Racially discriminatory language' " is language "that, to an objective observer, explicitly or implicitly appeals to racial bias." (*Id.*, subd. (h)(4).) Here, no objective observer would have understood Baker's questioning as either exhibiting or implicitly appealing to racial bias against his Latina client, Maria Ricardo, or against Barrera. Counsel's questioning is most reasonably understood as an effort to ensure that no jurors, regardless of their own background, harbored racial or other biases toward either of the defendants. Just as the juror questionnaire had asked jurors whether they would be biased against parties or witnesses who came from a "national,

75

racial or religious group . . . *different* from your own," counsel evidently sought to determine at voir dire whether any prospective jurors would harbor biases against parties or witnesses because they shared somewhat similar backgrounds.

In so concluding, we do not condone the manner in which counsel conducted the questioning. Counsel could have explored his concerns about prospective jurors' potential racial and ethnic biases without engaging in a disparate pattern of questioning based on prospective jurors' perceived race or ethnicity. But the manner in which counsel questioned the Latino prospective jurors about the possibility of bias against his client does not raise any genuine concern about whether Barrera's conviction or sentence was obtained through impermissible discrimination against him because of his race, ethnicity, or national origin. We therefore conclude it does not constitute a violation of the RJA. (See § 745, subd. (a).)

### c. Statements by Defense Counsel

Barrera next contends that an RJA violation occurred during jury selection when Barrera's counsel twice used the term "illegal alien" in questioning prospective jurors about their biases. Specifically, in his questioning of R.H., who was eventually seated as a juror, counsel asked, "Do you have any prejudices against illegal aliens?" Then, after describing that question as "unfair," counsel rephrased, asking: "Do you have any prejudices that would interfere with you being fair and impartial to Mr. Barrera?" Similarly, in questioning Prospective Juror J.L., counsel said, "you heard what I mentioned earlier about the fact that [Barrera] — he doesn't speak English, might be an illegal alien, is a citizen of Mexico. [¶] Is that going to make a difference to you?" Barrera contends

counsel's use of the term "illegal alien" constitutes racially discriminatory language that requires reversal.

The Attorney General argues, for his part, that defense counsel's use of the words " 'illegal aliens' in the general sense . . . did not amount to 'racially discriminatory language' " because defense counsel's questions were used "for tactical reasons . . . to identify and excuse prospective jurors who may have any bias against Barrera as a Mexican citizen residing illegally in the United States," and because the statements did not "exhibit 'bias or animus' *towards* Barrera."

We agree with the Attorney General that counsel's efforts to probe whether prospective jurors had impermissible biases against "illegal aliens" do not constitute a violation of the RJA. We caution, however, that the inquiry under section 745(a)(2) does not turn on whether counsel had subjectively benign reasons for using racially discriminatory language. Counsel's subjective motivations are not, in general, determinative of whether the language was an RJA violation — using discriminatory language or otherwise exhibiting bias or animus toward a defendant is a violation "whether or not purposeful." (§ 745(a)(2).) The operative question is whether an objective observer would understand counsel's comments as explicitly or implicitly appealing to bias against Barrera because of his race, ethnicity, or national origin. (§ 745, subds. (a)(2), (h)(4).)

As we explain more fully in *Bankston* (June 1, 2026, S044739) __ Cal.5th __ [2026 Lexis ____] [pp. 86–87], the RJA's prohibition on uses of discriminatory language is necessarily sensitive to context. It extends to facially neutral language that implicitly appeals to racial bias, not just uses of racial epithets or overtly racial overtures. As such, the prohibition requires a

nuanced inquiry. There are many uses of facially neutral language that may or may not reflect racial or other bias, depending on the manner in which they are used. The RJA recognizes that the discriminatory character of a word or phrase may not be evident from examining the language in isolation, which is why it advises on the one hand that "[e]vidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory," (§ 745, subd. (h)(4)), and excludes on the other hand, potentially discriminatory statements that "relat[e] language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect" (*id.*, subd. (a)(2)).

Courts have noted that the term "illegal alien" may evoke racial bias in certain contexts. (See, e.g., *Alhaj v. New York City Health and Hospitals Corporation* (N.Y.Sup.Ct. 2022) 77 Misc.3d 1063, 1080 [177 N.Y.S.3d 433] ["certain facially nondiscriminatory terms can invoke racist concepts that are already planted in the public consciousness — words like . . . 'illegal alien.' "].) But considering the context, we are not persuaded that an objective observer would view defense counsel's question in this manner. As the Attorney General suggests, an objective observer would understand that counsel was asking the question to ensure that no prospective juror harbored impermissible biases against his client based on his status as an undocumented Mexican immigrant. And while counsel might well have worded his question differently if he were asking it today, Barerra has not shown that an objective

observer at the 2001 trial would have understood counsel's choice of language as racially discriminatory.[10]

Given the time and the context, we are not persuaded that the manner in which counsel questioned prospective jurors about their potential biases was itself a demonstration of bias that violated the RJA.

We are mindful that, as Barrera emphasizes, his 2001 trial took place at a time when there were strong public sentiments about "illegal immigrants," as evidenced by the 1994

---

[10] Compare, e.g., *Hoffman Plastic Compounds, Inc. v. NLRB* (2002) 535 U.S. 137, 147 ["In 1986, . . . Congress enacted [the federal Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States"]; *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 659 ["Thus, the [federal Immigration and Nationality Act] now provides for criminal and civil sanctions against an employer who knowingly hires or recruits for employment an illegal alien"]; *Congress of Cal. Seniors v. Catholic Healthcare West* (2001) 87 Cal.App.4th 491, 511 [" 'In that case, plaintiff migratory farmworkers sought an injunction prohibiting defendant ranch owners from knowingly employing illegal aliens' "], quoting *People ex rel. Dept. of Transportation v. Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 523).

The dissent observes that after asking the first prospective juror if he had any prejudices against "illegal aliens," Barrera's counsel withdrew the question as "unfair" and restated it without using the term. (Dis. opn. of Evans, J., at pp. 8–9, fn. 3.) But the record of this exchange does not support the conclusion that counsel (or "any objective observer" at the time) recognized "the pejorative and implicitly discriminatory meaning of the term." (*Ibid*.) Moments later, counsel used the phrase again, asking the next prospective juror whether the fact that Barrera might be "an illegal alien" would "make a difference."

passage of Proposition 187, a ballot measure that limited the "availability of public benefits, including elementary school education and medical care" to undocumented immigrants, based on findings that Californians were "suffering economic hardship" and "suffering personal injury and damage" due to the presence of "illegal aliens" in the state. (Prop. 187, § 1, as approved by voters, Gen. Elec. (Nov. 8, 1994).) As the record of jury selection in this very case suggests, negative sentiment against "illegal aliens" could be difficult to disentangle from racial or ethnic bias. But as any objective observer would have understood, this is precisely why counsel was asking the questions in voir dire: to ensure that such sentiments played no role in the jury's determinations of Barrera's guilt or penalty. Under the circumstances, no objective observer would have understood counsel's questioning about prospective jurors' potential prejudices as either exhibiting or implicitly appealing to racial bias.

### 3. *Guilt Phase RJA Claims*

Barrera claims that the prosecutor's opening statement violated the RJA by commenting unfavorably on his work as a street vendor and that the prosecutor's closing argument violated the RJA by using language comparing him to an animal. We find no RJA error in the opening statement. We assume the prosecutor's statement at closing violated the RJA, but conclude that any error was harmless beyond a reasonable doubt.

### a. *Comments on Barrera's Occupation*

Barrera argues that the prosecutor's comments in her opening statement about his occupation as a street vendor violated the RJA. He contends the prosecutor "mocked Mr.

Barrera for having his kids help him sell corn on the street." He takes particular issue with the prosecutor describing him as "an enterprising man" and the "big boss." He also argues that the prosecutor's questioning of Barrera's children about street vending and his codefendant's counsel's comments about his street vending violated the RJA.

Barrera asserts that the comments about the corn selling business "demonized a common and highly visible occupation for poor Latinxs who migrate to this country and cannot find other work due to their immigration status." He notes that "[i]n Los Angeles, street vending is heavily associated with Latinx migrants" and that "[c]hildren are frequently involved in the street vending business, often after school, to help support the family." He points out that "[a]t the time of [his] trial, Los Angeles had just criminalized street vending" following the 1994 passage of Proposition 187. Against this backdrop, Barrera argues, mentioning his participation in street vending was an "appeal[] to . . . anti-Latinx bias[]."

We find no violation in the challenged comments. To establish an RJA violation, Barrera must show that the prosecutor either "used racially discriminatory language" about him or "otherwise exhibited bias or animus" toward him based on his race, ethnicity, or national origin. (§ 745(a) (2).) The RJA does not forbid presentation of, or comment on, relevant evidence concerning a defendant's activities.

Here, in the comments Barrera challenged, the prosecutor sought to draw attention to evidence relevant to the jury's consideration of the case before it: namely, that Barrera did not sell corn on the street himself, but instead directed his children and codefendant Maria Ricardo to sell corn late into the night,

and punished them if they did not bring home enough money. These comments provided relevant context about Barrera's family dynamics and the way he treated his children. This context was, in turn, highly relevant to the charges that Barrera had severely abused and ultimately murdered two of the children. The same is true of the comments made by codefendant's counsel about Barrera's decision to bring Petra and her children to the United States because "he needs a bigger labor force" to sell corn and the prosecutor's questions to Barrera's children about their experience street vending. While these comments and questions were not favorable to Barrera, an objective observer would not conclude that they explicitly or implicitly appealed to bias against him because of his race, ethnicity, or national origin.

### b. *Language at Closing Argument*

Barrera argues that the prosecutor violated the RJA when, during her closing argument at the guilt phase, she used dehumanizing language to describe Barrera. In the challenged portion of the argument, after describing the evidence concerning Barrera's treatment of Ernesto, the prosecutor said: "That's intent to kill. [¶] It's also torture. It's also sadistic, and it's also inhuman. And it's also, I don't know, to say it's the work of the devil doesn't even say it. [¶] I don't even know what to call this man. I would like to say that he's an animal, but I would not insult animals. And for sure he's not a human because I don't want to belong to the same specie[s] he does. What is he? He's evil. Evil in the shape of a man. I don't know what else you could call him. [¶] The defendant does all of these things to Ernesto and never gets him medical care because he wants him to die. That's intent to kill."

In his briefing in this court, Barrera has at times suggested that he is entitled to relief because the RJA broadly prohibits the use of *any* " 'language that compares the defendant to an animal.' " (§ 745, subd. (h)(4).) As our opinion in *Bankston* explains, however, the RJA does not categorically forbid all such language. (*Bankston*, *supra*, __ Cal.5th at p. __ [2026 Lexis ___ at p. ____] [p. 101].) "A prosecutor might, for instance, refer to a defendant as an 'eager beaver,' 'happy as a clam,' 'free as a bird,' or 'quiet as a mouse.' Each example involves language comparing a defendant to an animal; none would appear to raise racial discrimination concerns. The legally operative provision of the RJA is the provision prohibiting the use of 'racially discriminatory language,' which is defined as language that 'to an objective observer, explicitly or implicitly appeals to racial bias.' (§ 745, subds. (a)(2), (h)(4).) As the statute explicitly says, and the uncodified findings affirm, 'language that compares the defendant to an animal' can certainly fit this description. (*Id*., subd. (h)(4).)" (*Ibid*.) The RJA does not categorically prohibit uses of animal imagery; it instead prohibits those uses of animal imagery that are objectively understood as appealing to racial bias.

In initial briefing and at oral argument, the Attorney General conceded that the prosecutor's comments violated the RJA insofar as they compared Barrera to an "animal," but contended that the comments were harmless beyond a reasonable doubt. We later solicited supplemental briefing to address amendments to the RJA postdating oral argument. (See pp. 99–103, *post*.) That supplemental briefing does not explicitly address whether the Attorney General maintains his earlier position with respect to whether error occurred. In all events, we are not bound by the parties' litigating positions; whether the

comments amount to reversible error is an issue for the court to decide.

In addressing the claim, we make clear at the outset that the comments were inappropriate. It is true that we have previously approved the use of "harsh and pointed language" when warranted by the evidence of serious, harmful crimes like the ones charged in this case. (*People v. Nadey* (2024) 16 Cal.5th 102, 186.) But we have also advised prosecutors to "remain mindful of their obligations to uphold professional decorum" and to avoid language that risks "irrationally inflaming the jury or prejudicing it against the defendant." (*Ibid.*) Particularly in light of the passage of the RJA, which identifies comparisons to animals as a matter of particular concern, we now make clear that such language should not be used going forward, in relation to defendants of any race, ethnicity, or national origin. The language used in our courtrooms should reflect our bedrock understanding that "[t]hose who appear in our courts, no matter what crimes they stand accused or convicted of . . . are persons before the law." (*Id.* at p. 194 (dis. opn. of Liu, J.).) While we do not approve the prosecutor's comments, it is a different issue whether, considered in the specific context of this case, they constitute racially discriminatory language within the meaning of the RJA. We need not, however, decide whether an objective observer would regard the prosecutor's rapid-fire suggestions that Barrera had performed the "devil's work," had acted as no human or animal would, and was "[e]vil in the shape of a man," as invoking implicit racial bias — as opposed to invoking jurors' sense of revulsion to the defendant's treatment of his child, in a

manner unconnected to race.[11]   Assuming the comments did violate the RJA, we conclude any error was harmless.  (See *People v. Bankston, supra,* __ Cal.5th at p. __ [2026 Lexis ___ at pp. ____] [pp. 108-123].)

The applicable standard requires the People to demonstrate that the challenged language was harmless beyond a reasonable doubt.  (*Ibid.*; cf. *Chapman v. California* (1967) 386 U.S. 18, 24; § 745, subd. (k).)  The People have carried their burden here.   Barrera challenges a facially neutral, brief comment in a lengthy closing argument that consisted primarily of descriptions of Barrera's acts of extreme abuse of Ernesto and Lupita, the harmful effects those actions had on all of his children, and explanations of how those actions satisfied the elements of the crimes with which Barrera was charged.  Barrera raises no challenge to the overall message of the brief passage in question — namely, that Barrera's conduct toward Ernesto was "sadistic" and "inhuman" — nor does Barrera challenge the rhetorical conclusion of that passage, that Barrera himself was "evil in the shape of a man."  And perhaps more fundamentally, the comment was insignificant compared to the substantial evidence that Barrera beat, starved, and ultimately killed two of his children.  Any error in the prosecutor's

---

[11] Our concurring and dissenting colleagues rightly observe that, in some cases, language can appeal to implicit racial bias even when the prosecutor purports to be giving a factual description of a brutal crime.  (Dis. opn. of Evans, J., *post*, at p. 3; see also conc. opn. of Liu, J., *post*, at p. 3.)  We do not suggest otherwise.

comments had no reasonable possibility of affecting the jury's evaluation of the evidence or its determination of guilt.[12]

### c. *Cumulative RJA Errors during Pretrial Proceedings and Guilt Phase*

Barrera argues that the cumulative effect of the alleged violations during jury selection and his guilt phase trial resulted in a conviction obtained because of his ethnicity or nationality. He argues that for the jury to convict him, they needed to resolve ambiguity in the evidence about his intent and that because the "jurors had been barraged with appeals to anti-Latiné bias" they "judge[d] ambiguous conduct more harshly."

As a rule, courts should consider the cumulative effect of claimed RJA violations in addition to considering the effect of each challenged statement or action individually; consideration of the broader context of trial can help to reveal whether impermissible appeals to bias occurred, and thus whether a conviction or sentence was obtained in violation of the RJA. But here, looking at the claimed RJA violations cumulatively does not yield a different conclusion. We see in the record no barrage of appeals to anti-Latino bias. While we have made clear that

---

[12] After the initial oral argument in this case, the Legislature amended the RJA to, among other things, add a new Penal Code section 745, subdivision (*l*), stating: "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." (§ 745, subd. (*l*).) Barrera argues that this provision requires us to (a) to definitively decide whether prosecutor's challenged comments violated the RJA, and (b) if so, reverse the penalty judgment without regard to whether the comments were prejudicial. We address this argument below, in connection with Barrera's penalty-phase claims. (See pp. 99–103, *post*.)

the prosecutor's animal comments at closing argument were improper, and we assume without deciding that they violated the RJA, any error was harmless beyond a reasonable doubt. We find no cumulative RJA errors warranting reversal of the guilt judgment.

### 4. *Penalty Phase RJA Claims*

Barrera challenges penalty-phase testimony from a defense expert and the prosecutor's examination of that expert. He also contends that the prosecutor made improper dehumanizing comments in her closing statement. We find no error in the testimony or examination of the expert. We again assume the prosecutor's statement in closing violated the RJA, but conclude that any error was harmless beyond a reasonable doubt.

### a. Testimony of Defense Cultural Expert

Barrera first argues that an RJA violation occurred during the penalty phase trial when his expert witness "opined that being 'illegal' was a 'risk factor' that predisposed Mr. Barrera to commit child abuse." Barrera argues that the prosecutor's questioning of the expert also violated the RJA because it "emphasized that racially charged testimony." On review of the record, we conclude that neither the defense expert's testimony nor the prosecutor's questioning of the expert violated the RJA.

### i. *Background*

As part of his mitigation case at the penalty phase, Barrera put on Associate Professor Felipe Peralta as an expert witness. Peralta had done research on Mexican immigrants and child abuse, and had prior experience as an expert witness in noncapital child abuse cases. His testimony focused on risk factors associated with higher rates of child abuse, and how

many of these factors were present in this case.  Peralta focused, in particular, on conditions that would increase stress on a parent or guardian.

He listed undocumented status as one of the "indicators" that increase the risk of child abuse:  "I think by now that the problem of child abuse has been studied extensively in this country, and we have come up with some indicators that would give us a very good idea when families are more likely to abuse their children.  [¶] . . . [¶] . . . one of them would be young people that get married at a very early age. . . .  [¶]  . . . [T]he economic situation of the family . . . .  [¶]  The legal status of people in this country.  I think if you're illegal, there's a lot more pressure under those conditions.  There is more potential for child abuse. [¶]  Socialization is perhaps one of the biggest ones.  If you are not in the mainstream in society with other persons, there is a very high likely possibility of child abuse."

Later, when asked about whether there were "indicators that something like [the murders of the two children] is more likely in [Barrera's] situation than in most other people's situation," Peralta gave a longer list of risk factors that were present in the case:  "I think this situation had too many risk factors involved.  I mean, usually most child abuse cases, you find one or two, but I would guess in this situation . . . I would come up with maybe ten risk factors which creates a condition where children would be abused on a regular basis."  When asked to enumerate the factors, Peralta listed the fact that Barrera married at an early age, the family's uncertain economic situation due to the legal and economic precarity of street vending, the fact that Barrera had two households, Barrera's immigration status, Barrera's social isolation, his lack

of close ties with extended family, the large number of children in the family (14), the mixing of families, the fact that Maria Ricardo probably did not like that she was being asked to take in children Barrera had with her sister, and lack of direction within the family.

In relevant part, Peralta's more detailed statement about the effect of Barrera's immigration status as a risk factor was: "I think the other [risk factor] was the legal status of [Barrera]. [¶] [Barrera] had gotten to the point that he had actually had a passport to actually live and work in this country. Again, for whatever reasons, he lost that status. [¶] And also, there was an incident if I remember, there was an incident where he was actually caught bringing some people from Mexico. He thought that was going to come up eventually. [¶] So for all practical purposes, he knew at any time the immigration department was going to catch him, he would probably be deported to Mexico. So that's a lot of pressure right there."

On cross-examination, the prosecutor questioned Peralta about his analysis of the situation, and of the risk factors listed. The prosecutor engaged Peralta in the following colloquy: "[Q.] So he's an illegal immigrant? How many illegal immigrants are in the United States[?] And you studied this. How many of them beat and starve their children? [¶] So the child has every bone broken, his whole body has bruises, and he has brain damage and dies from that. [¶] How many of them do that?" [¶] [A.] I don't think too many in our society. That's not acceptable in our society. [¶] [Q.] How often? [¶] [A.] All you have to do is look at the statistics where we have children being killed in every walk of life in this country. [¶] [Q.] It's because they are illegal immigrants? [¶] [A.] No. The pressure in this

society and they take it out on the children. [¶] [Q.] So you can't say that because he's an illegal immigrant that's why he does this? [¶] [objection due to compound question sustained] [¶] [Q.] . . . Would you want to say that he being [*sic*] illegal immigrant makes it more likely to beat your children? [¶] [A.] Yes. [¶] [Q.] You would? Okay."

### *ii. Discussion*

Barrera argues that his defense expert's testimony at the penalty phase violated the RJA because it encouraged jurors to conclude that his status as an undocumented immigrant predisposed him to abuse his children. He notes that, in enacting the RJA, the Legislature specifically identified concerns with expert testimony relating racial stereotypes. (See Stats. 2020, ch. 317, § 2, subd. (d).) He contends that Peralta's testimony crosses the line the Legislature drew, insofar as his discussion of undocumented immigrants would have been understood as pertaining particularly to persons of Mexican and other Latino background.

In response, the Attorney General cites a provision of the RJA that makes clear that the RJA's prohibition on discriminatory language does not apply "if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) The Attorney General's reliance on this provision is peculiar, since Peralta's testimony had nothing to do with Barrera's physical appearance. But to the extent the Attorney General's broader point is that Peralta's testimony was race-neutral and nondiscriminatory, we agree. Peralta did not testify, for instance, that certain racial or ethnic groups were, by virtue of their race or ethnicity, more or less likely to engage in child abuse. He instead testified as to

multiple risk factors for child abuse that include sources of familial stress and isolation.  He testified that one such source of stress — one that was particularly relevant in Barrera's own experience — was the stress of living in the United States as an undocumented immigrant.  Although Peralta's testimony may have drawn further attention to Barrera's immigration status, it did not exhibit or appeal to prohibited racial bias.

This case bears no resemblance to *Buck v. Davis* (2017) 580 U.S. 100, on which Barrera relies.  In *Buck*, a defense psychologist testified at the penalty phase that Buck was unlikely to be violent in the future but submitted a report that stated that "one of the factors pertinent in assessing a person's propensity for violence was his race, and that Buck was statistically more likely to act violently because he is black." (*Id.* at p. 104.)  The high court found grounds for reversal.  It explained: "Given that the jury had to make a finding of future dangerousness before it could impose a death sentence, [the expert's] report said, in effect, that the color of Buck's skin made him more deserving of execution." (*Id.* at p. 119.)  The court held that the introduction of this testimony prejudiced him, and that by allowing the testimony to be introduced, his counsel had rendered ineffective assistance.  (*Id.* at pp. 122, 128.)

In this case, by contrast to *Buck*, Peralta never suggested, directly or indirectly, that Barrera was more deserving of execution because he was of a particular racial or ethnic background.  He instead opined that Barrera faced multiple sources of stress and isolation — including but not limited to the stresses of living in the United States as an undocumented immigrant — that tended to mitigate his culpability for the crimes for which he had already been convicted.  Again,

Peralta's testimony was facially race-neutral. And to the extent Peralta's testimony raised Barrera's immigration status, it was to make the point that Barrera was less deserving of execution, not more. Tellingly, and also in contrast to *Buck*, Barrera makes no claim that defense counsel performed deficiently in presenting Peralta's testimony as part of the defense's mitigation case. We perceive no RJA error.

Barrera also argues that the prosecutor's cross-examination of the defense expert violated the RJA because she "emphasized [Peralta's] racially charged testimony . . . by asking [him] question after question about the prevalence of 'illegal immigrants' beating and starving their children and only stopping after [Peralta] unequivocally agreed that 'being an illegal immigrant makes it more likely to beat your children.' " Barrera's framing implies that the prosecutor's questioning was aimed at making Barrera seem violent because of his undocumented status. It is, however, clear from the record that this was the opposite of what the prosecutor was doing. As the transcript makes clear, the prosecutor was trying to undermine the defense's efforts to rely on Barrera's immigration status, as well as his other life experiences, as circumstances in mitigation of his crimes. In so doing, the prosecutor elicited from Peralta that most undocumented immigrants do not, in fact, engage in the type of conduct of which Barrera had been convicted. She stopped her line of questioning, however, when Peralta repeated his earlier point that being undocumented is one of the factors associated with a higher risk of child abuse.

In the challenged portions of the transcript, both Peralta and the prosecutor used the terms "illegal alien" and "illegal immigrant" to refer to Barrera's immigration status. While,

again, both parties might have used different language were trial held today, we cannot conclude on this record that Barrera has satisfied his burden to demonstrate that the terminology used would be understood by an objective observer as appealing to racial bias in the context of the 2001 trial.

### b. *Prosecutor's Closing Argument*

Barrera argues that the prosecutor violated the RJA in her closing argument at the penalty phase. In the challenged portion of the argument, the prosecutor told jurors: "[The defense] will present evidence under the (k) section [i.e., mitigating factors] and that's why [Barrera's] parents were here. [¶] Now, you can't let sympathy for the parents, because everybody that loses a child — except for the defendant, of course — is heart broken. And I do have great sympathy for his parents, but they were here to tell you that he's a human being in their mind, and that he's their son, and to feel sorry for him. That's why they're here. [¶] Good people. Good people. [¶] And he used that most fully. [¶] Why do I say that? We, the people of the state of California, we the citizens, we don't torture and murder our children. And we, the citizens of the United States, don't do that. Do citizens of the world? No human being tortures or murders their children and no animal of nature does it. [¶] Basic law of nature, we do not torture and murder our children. We don't do it. His parents know that. That's why they are here."

Barrera argues that the prosecutor's comments violated the RJA by distinguishing between " '[w]e, the people . . . the citizens' and others . . . includ[ing] Mr. Barrera, and impl[ying] that the others might be more inclined to torture and murder their children." He also argues that the comments violated the

RJA because, much as in her guilt phase closing argument, the prosecutor used language implicitly comparing Barrera and his actions to those of an animal: "No human being tortures or murders their children and no animal of nature does it. [¶] Basic law of nature, we do not torture and murder our children. We don't do it."

In addressing this claim, we emphasize that our courts guarantee a fair trial to all who come before them, regardless of their citizenship status. We thus strongly caution counsel against using language that gratuitously calls attention to the citizenship status of noncitizens. We likewise reiterate what we have said above: language that negatively compares a defendant to an animal, or that otherwise seeks to dehumanize the defendant, is improper.

But once again, it is a separate question whether the particular comments at issue here, considered in context, constituted racially discriminatory language in violation of the RJA. As the Attorney General rightly acknowledges, an argument appealing to the jurors as fellow "citizens" in some circumstances can be objectively understood to evoke an implicit bias against noncitizens that is bound up with racial and ethnic bias. But reading the challenged comments in the broader context of arguments presented to the jury, it is not clear that the characterization fits in this particular case. Certainly an objective observer would not understand the comments to suggest that noncitizens "might be more inclined to torture and murder their children," as Barrera argues. An objective observer instead would understand the comments to suggest the opposite: that the jury should reject any effort to rely on the stresses associated with Barrera's immigration status as a

factor in mitigation, because the law against torturing and murdering one's children is universal. It seems clear that the inference the prosecutor intended for listeners to draw was that it was wrong to suggest, as the defense had, that the fact Barrera was not a citizen in any way helped to explain his behavior towards his children. This point is underscored by the prosecutor's pointed description of Barrera's parents, whom the jury knew also to be noncitizens, as people who care for their son and who understand that torturing and killing one's child is wrong. Later in closing, the prosecutor would return to this theme, dismissing the "few flimsy excuses" offered by the defense expert.

The prosecutor's comments were, however, phrased in a manner that could be understood as gratuitously calling attention to the differences between citizens and noncitizens. And they were swiftly followed by language comparing Barrera's actions to those of an animal: "No human being tortures or murders their children and no animal of nature does it." As with the prosecutor's similar comments at the guilt phase, we assume for the sake of argument that these comments violated the RJA. In the context of this case, any violation was harmless beyond a reasonable doubt.

As an initial matter, the challenged comments were made only briefly and in passing, neither explicitly or flagrantly appealed to racial bias, and were part of an evident effort to comment on matters fairly presented to the jury for its consideration. More fundamentally, we do not see how the language in question, considered in the context of this trial, could have meaningfully affected the jury's weighing of the case

in aggravation against the defense's mitigation case, or its ultimate decision with respect to the appropriate penalty.

The prosecution's case in aggravation was strong. This is reflected in the trial court's statement in denying the automatic motion to reduce the penalty: "[T]he circumstances of this crime under factor (a) are horrendous. As counsel knows — and this goes to my determination under factor (a), the circumstances of the crime — I'm a specialist in this type of field. I teach death penalty litigation to judges throughout the State, and I have tried 17 of these cases. I'm told that's more than any other judge in the State . . . this by far is the most horrendous factual circumstance I have ever heard in 28 years in criminal law." In closing, the prosecutor emphasized that Barrera both physically and "mentally tortured" his victims. She remarked on his "cowardice" in forcing Lupita's own brother to take the blame for her death. She reminded the jurors that Barrera forced two of his older sons to dig Lupita's and Ernesto's graves, and mutilated Lupita's corpse with acid. In addition to the troubling circumstances of the crime, several of Barrera's surviving children testified about the abuse they had suffered at Barrera's hands and the abuse he had inflicted on Petra, his wife.

Barrera's case in mitigation was, by contrast, weak. The case consisted of testimony from Barrera's parents, his aunt and his uncle, and the testimony of Peralta. His family's testimony consisted primarily of descriptions of the economically disadvantaged situation Barrera grew up in. Both his father and his uncle denied that Barrera was abused as a child.[13]

---

[13] Our dissenting colleague points to a report prepared by Peralta, claiming that Barrera's father beat him "severely on numerous occasions" during his childhood. (Dis. opn. of Evans,

When asked by the prosecutor whether they were aware of the manner in which Lupita and Ernesto were killed, Barrera's family indicated that they were not aware of the facts of the case, and that all they knew was that Barrera had been convicted of murdering two of his children. Although defense expert Peralta testified to the numerous "risk factors" for child abuse present in this case and the stresses Barrera likely experienced, Peralta also testified that Ernesto's case was one of the worst child abuse cases he had seen, and that there was no excuse for Barrera's behavior toward his child.

Barrera's closing argument starkly illustrated the imbalance of aggravating and mitigating factors. His counsel said that he produced Barrera's parents to remind the jury that Barrera was a human being, but noted that they were also "victims," and said, "I'm not in any way asking you for sympathy for him." Then he urged the jury to spare Barrera's life to avoid further "damaging" his living children who might someday forgive him and desire a relationship — an argument the jury was obligated to disregard, as they were later instructed that "[s]ympathy for the family of the defendant is not a matter you

---

J., at pp. 25–26.) But the source of this information, and its reliability, is unclear; the only evidence presented at trial was to the contrary, and the defense itself disclaimed any argument that Barrera had suffered abuse as a child, telling the jury: "[A] lot of times, I think you might hear a psychologist say that the parent who abuses was an abused child. You're not going to hear that." The report on which the dissent relies was, notably, introduced into evidence by the *prosecution* rather than the defense, and certainly not for the purpose of bolstering Barrera's case in mitigation.

can consider in mitigation." (See *People v. Ochoa* (1998) 19 Cal.4th 353, 456.)

In short, the penalty-phase evidence leaves no room for reasonable doubt that the challenged comments — which were both brief and neutral on their face — affected the penalty verdict. We conclude that any RJA error from the prosecutor's closing was harmless.

After initial briefing and oral argument in this case, the Legislature enacted amendments to the RJA. (Stats. 2025, ch. 721, § 2.) We ordered additional briefing and reargument in this and other pending cases to consider the effect of these 2025 amendments on the proper disposition following a finding of RJA error in a capital case. (See also *Bankston*, *supra*, __ Cal.5th at p. __ [2026 Lexis ___ at pp. ____] [p. 126].)

Barrera contends that even if the RJA otherwise permits harmlessness review, the recent 2025 amendments to the RJA make clear that we cannot take this approach in capital appeals. He contends that we must determine whether or not the language in fact violated the RJA, because if it did, he is automatically ineligible for the death penalty, regardless of whether any error could have had any possible effect on the verdict. His argument rests on new subdivision (*l*). Before the 2025 amendments, subdivision (e) stated that the court shall "impose a remedy" for violations of subdivision (a), "except as provided in subdivision (k), or for an initiative approved by the voters" (§ 745, subd. (e)), and included the following in the list of remedies: "[w]hen the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." In the 2025 amendments, the Legislature moved this language, verbatim, to a standalone section,

subdivision (*l*), which now reads in full: "When the court finds there has been a violation of subdivision (a), the defendant shall not be eligible for the death penalty." The uncodified legislative findings state that this change was intended to clarify "that the prohibition on death sentences for cases in which an RJA violation occurs is categorical, and not a remedy in itself." (Stats. 2025, ch. 721, § 1, subd. (e).)

The Attorney General reads the new subdivision (*l*) as making "explicit that the death penalty bar applies whenever an RJA violation is found, regardless of whether that violation is prejudicial." The Attorney General argues that while this bar may be valid in some applications, it is unconstitutional in others. In particular, the Attorney General argues that in some applications, a death penalty bar would constitute an unconstitutional amendment of the Briggs Initiative, the voter initiative that gave rise to the current capital punishment law, by preventing the prosecution from pursuing the death penalty in circumstances where the voters determined the defendant should be eligible. The Attorney General's supplemental briefing on the 2025 amendments does not, however, directly address the proper disposition in this case, given his arguments about the constitutionality of subdivision (*l*) as the parties read it.

As the arguments of the parties suggest, reading subdivision (*l*) as requiring automatic reversal of the death judgment, including in cases of nonprejudicial error, would raise at least two substantial, interrelated constitutional questions. First, as we have discussed above, invalidating a judgment of death without regard to prejudice would raise substantial questions under article VI, section 13 of the state Constitution,

which permits courts to reverse a judgment only when the court finds, after reviewing the record, that an error has led to a "miscarriage of justice." (Cal. Const., art. VI, § 13.)

Second, as the Attorney General argues, and as explained in greater detail in our opinion in *Bankston*, *supra*, __ Cal.5th at p. __ [2026 Lexis ___ at pp. ____] [pp. 127–135], the 1978 Briggs Initiative instructed that the death penalty must remain available for defendants convicted of special circumstance murders. (See Prop. 7, as approved by the voters, Primary Elec. (Nov. 7, 1978) § 8 ["[T]he trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances."].) As we explain in *People v. Bankston*, " 'the Legislature is powerless to act *on its own* to amend an initiative statute.' " (*Bankston*, *supra*, __ Cal.5th at p. __ [2026 Lexis ___ at pp. ____ [p. 129] [quoting *People v. Kelly* (2010) 47 Cal.4th 1008, 1045 (*Kelly*)].) "To interpret subdivision (*l*) as making the death penalty unavailable for a large class of pre-RJA defendants convicted of special circumstance murders, based on non-prejudicial uses of facially neutral language, would create serious questions about whether the Legislature has impermissibly attempted to override the judgment of the voters who enacted the Briggs Initiative as governing law." (*Ibid.*)

As a general rule, "we presume 'the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.' " (*People v. Superior Court* (*Guevara*) (2025) 18 Cal.5th 838, 857; *People v. Buza* (2018) 4 Cal.5th 658, 682 ["the usual rule [is] that a statute

will be interpreted to avoid serious constitutional questions if such an interpretation is fairly possible"].) Here, considering both the broader statutory context and the operative constitutional limits on legislative action, we conclude that subdivision (*l*) should not be read as commanding an automatic reversal rule in cases in which the judgment was entered before the effective date of the RJA, based on non-prejudicial violations involving the use of facially neutral language found or assumed to appeal to implicit racial bias.

In adopting this reading, we are mindful of the drafting history that led to the creation of new subdivision (*l*). When the Legislature first enacted the language now contained in subdivision (*l*), it consciously avoided constitutional difficulties by not only including an exception for cases subject to subdivision (k), which set forth the harmless-error standard for retroactive RJA claims raised by "petition," but also by including an exception "for an initiative approved by the voters." (§ 745, subd. (e).) Despite the enactment of the 2025 amendment, the operative text of the provision has remained the same; the amendment simply moved it to a new subdivision.

The parties contend that the relocation could only have been meant to cast off the limitations of subdivision (e), and forbid the death penalty for any RJA violation, regardless of error. But another interpretation is possible. The creation of a standalone section might simply underscore the point that a *prejudicial* RJA violation will *at least* require invalidating the penalty judgment, without precluding other remedies under subdivision (e) as appropriate. The operative text contains no clear indication that by creating a standalone subdivision the Legislature intended to avoid applicable constitutional

limitations on its ability to prescribe a rule redefining death eligibility or prescribing automatic reversal of a judgment in the absence of prejudice, and we will not lightly impute such an intent where no clear signals appear.

The parties also point to uncodified findings accompanying the amendment. (Stats. 2025, ch. 721, § 1, subd. (e) ["[T]he prohibition on death sentences for cases in which an RJA violation occurs is categorical, and not a remedy in itself"].) But the findings say nothing about the applicability of harmlessness analysis; the "category" is not specified. Like the statutory text itself, this brief comment is compatible with a "categorical" prohibition of death with respect to prejudicial violations. Accordingly, we find that these remarks do not clearly evince an intent to require penalty reversals in pre-RJA cases based on nonprejudicial uses of facially neutral language. And in any case, while we afford due consideration to such statements, they do not absolve us of our duty to interpret the statutory text as enacted. (See, e.g., *McClung v. Employment Department* (2004) 34 Cal.4th 467, 472 ["Subject to constitutional constraints, the Legislature may enact legislation. But the judicial branch *interprets* that legislation"].)

We conclude, in short, that subdivision (*l*) is not properly read to categorically forbid the imposition of the death penalty for all RJA errors, including errors involving the use of facially neutral language at trials in which judgment was entered before the RJA's effective date, without regard to whether those errors were prejudicial. Such an approach, should the Legislature choose to employ it, would run grave risks of overstepping constitutional limits on legislative action. And for the reasons we have already set forth, pre-enactment RJA violations

resulting from improper uses of facially neutral language are not reversible if the People can show that the use of language was harmless beyond a reasonable doubt. Accordingly, we are not persuaded that the enactment of subdivision (*l*) affects the proper result in this case.

The jury's task at the penalty phase "is inherently moral and normative, not factual[.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779.) Any appeal to implicit racial bias warrants especially careful scrutiny when jurors must weigh character in the balance of aggravating and mitigating circumstances. But here, the People have carried their burden to demonstrate that the claimed RJA violations were harmless beyond a reasonable doubt. There is no reasonable possibility that the jury in this case — weighing the harrowing circumstances surrounding the torture-murder of Barrera's two children against a notably weak case in mitigation — would have rendered a different decision had the challenged comments not been made.

We reiterate, finally, that our evaluation of the impact of the challenged comments in this particular case should in no way be misunderstood. We have too long tolerated the use of dehumanizing language that is inconsistent with the basic respect to which all litigants are entitled. In passing the Racial Justice Act, the Legislature recognized that the use of such language frequently creates an unnecessary, unjustified risk of undermining the fundamental tenet that all litigants are entitled to equal treatment under the law, no matter their race, ethnicity, or national origin. We now make clear, in no uncertain terms, that language that seeks to dehumanize a criminal defendant has no place in California's courtrooms.

Our concurring and dissenting colleagues worry that to the extent our analysis of the issues in this case differs from theirs, we risk blunting this critical message. (See conc. opn. of Liu, J., *post*, at p. 2 [arguing that we should find RJA error rather than assume it, but agreeing the error was harmless]; dis. opn. of Evans, J., *post*, at pp. 12–21 [arguing that the prosecutor's remarks require reversal of the judgment].) Our job, of course, is to decide the issues before us, in accordance with the governing statutory and constitutional law. But there is nothing "tentative" or "non-binding" about our condemnation of the use of dehumanizing language in the courtroom. (Dis. opn. of Evans, J., at p. 2.) Nor is it correct to suggest that the use of such language "carr[ies] no legal consequence." (Conc. opn. of Liu, J., at p. 2.) We underscore what should perhaps be an obvious point: The obligation to ensure equal treatment in California's courtrooms is an obligation that belongs in the first instance to the trial courts, which must remain vigilant to ensure that each litigant is treated with equal dignity and fundamental fairness. It is an obligation that also belongs to the officers of the court whose professional responsibilities include a duty to uphold these principles of equal treatment. And to the extent these actors fail to fulfill these obligations, they run a very real risk of legal consequences, as today's decision in *Bankston* illustrates. (*Bankston, supra*, __ Cal.5th at p. __ [2026 Lexis ___ at pp. ____] [pp. 97–108] [reversing death penalty verdict in light of prosecutor's remarks in violation of the RJA].)

## B. Constitutional Challenges to Death Penalty Law

Barrera raises a number of challenges to our state's death penalty statute. He recognizes we have previously rejected these arguments but, citing *People v. Schmeck* (2005) 37 Cal.4th

240, presents them to urge reconsideration and preserve the claims for federal review. We have repeatedly declined to reconsider identical challenges, and we do the same here.

"[Penal Code] [s]ection 190.2 is not impermissibly broad." (*People v. Rountree* (2013) 56 Cal.4th 823, 862; see *Beames, supra*, 40 Cal.4th at pp. 933–934.) "[Penal Code] [s]ection 190.3, factor (a), allowing aggravation based on the circumstances of the crime, does not permit arbitrary and capricious sentencing." (*Turner, supra*, 10 Cal.5th at p. 827; see *Rountree*, at p. 862.) "The death penalty statute 'is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt.' [Citation.] The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 have not altered these conclusions." (*Lopez, supra*, 5 Cal.5th at p. 370; see *Turner*, at p. 827 [no constitutional requirement of unanimity as to proof of unadjudicated criminal activity].) The " 'so substantial' " language in the instruction informing jurors how to weigh aggravating and mitigating evidence is "not overbroad or unconstitutionally vague." (*Turner*, at p. 828; see *People v. Beck & Cruz* (2019) 8 Cal.5th 548, 671; *Roundtree*, 56 Cal.4th at p. 863.)

The court is also "not constitutionally obligated to delete inapplicable sentencing factors" or to "instruct that certain factors are relevant only for mitigation purposes." (*Turner, supra*, 10 Cal.5th at pp. 828–829; see *People v. Elliott* (2012) 53 Cal.4th 535, 594.) The instructions are also not constitutionally

flawed because they permit a jury to return a death verdict if the aggravating circumstances " 'warrants' " death rather than life without parole. (*People v. Williams* (2010) 49 Cal.4th 405, 471; see *People v. Arias* (1996) 13 Cal.4th 92, 171.) Nor is it error if the instructions failed to inform the jury that if they found the mitigating evidence outweighed the aggravating evidence, they must return a sentence of life without parole. (*People v. Page* (2008) 44 Cal.4th 1, 57.) There is also no requirement the court instruct the jury on the burden of proof or the lack of a unanimity requirement as to mitigating circumstances (*Potts*, *supra*, 6 Cal.5th at p. 1061, quoting *People v. Ghobrial* (2018) 5 Cal.5th 250, 292), or that it "instruct the jury that life imprisonment without possibility of parole is presumed to be the appropriate penalty unless the prosecution proves to the contrary" (*People v. Elliott*, at p. 594). "Intercase proportionality review is not constitutionally required." (*Turner*, at p. 829.) " 'The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants.' " (*Lopez*, *supra*, 5 Cal.5th at p. 371, quoting *People v. Thomas* (2012) 53 Cal.4th 771, 836.) "California's capital sentencing scheme does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments." (*Turner*, at p. 829, citing *Beck and Cruz*, *supra*, 8 Cal.5th at p. 671.)

## C. Cumulative Error

Barrera contends cumulative error requires us to reverse the judgment. We found that the trial court erred in denying Barrera's request for a no-adverse-inference instruction in the penalty phase. We have also assumed five additional errors: (1)

the admission of Dr. Boger's report about additional fractures to Lupita's body; (2) the failure to instruct the jury on second degree felony murder based on the felony of torture; (3) comments from the prosecutor that might have been understood, in isolation, as prohibited commentary on Barrera's failure to testify or to personally confess guilt; (4) that the prosecutor's closing statement at the guilt phase violated the RJA; and (5) that the prosecutor's remarks at the penalty phase closing violated the RJA. We conclude that these found or assumed errors were harmless in isolation; they are likewise harmless when considered cumulatively.

## V. CONCLUSION

We affirm the judgment in its entirety.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**JENKINS, J.** *

---

*        Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BARRERA

S103358

Concurring Opinion by Justice Liu

I join today's judgment upholding the guilt and penalty verdicts, including the determination that the asserted California Racial Justice Act of 2020 (RJA) claims are harmless beyond a reasonable doubt.  (Stats. 2020, ch. 317; see Pen. Code, § 745.)  Given the horrific circumstances of defendant Marcos Esquivel Barrera's offenses, this is a rare instance in which the "extraordinarily difficult" burden of establishing harmless error in capital sentencing (*People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __, __ [p. 34] (conc. opn. of Evans, J.) (*Bankston*)) has been met.

Contrary to today's opinion, however, I agree with Justice Evans that multiple violations of the RJA occurred in this case.  These violations are cogently elucidated by Justice Evans in her separate opinion, though some of the violations require little elucidation.  The prosecutor's "use of animal imagery" (Stats. 2020, ch. 317, § 2, subd. (e)), calling Barrera an "insult" to animals, and the prosecutor's denigrating, "gratuitous references to [Barrera's] nationality . . . or immigration status" (Stats. 2025, ch. 721, § 1, subd. (c)) are squarely prohibited by the RJA.  (See Pen. Code, § 745, subd. (h)(4) [" 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including . . . language that compares the defendant to an animal, or language that references the defendant's . . . culture, ethnicity, or national origin."].)  And the term "illegal alien" — used by

1

multiple actors in referring to Barrera, who is Mexican — is widely recognized, especially in California, as a "word[] . . . used . . . disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin" and, for that reason, was "discriminatory" here. (*Ibid.*)

Today's opinion "repeatedly acknowledges that something was amiss in this trial." (Dis. opn. of Evans, J., *post*, at p. 20.) The court at least six times in today's opinion says that counsel used inappropriate or inadvisable language. (*Id.* at pp. 20–21, citing maj. opn., *ante*, at pp. 76–79, 84–85, 87, 93–94, 97.) And yet, the court is unwilling to find even one violation of the RJA — an outcome all the more remarkable in light of the Attorney General's concession that the prosecutor's animal comparison plainly violates the statute. While I am all for admonishing litigants to avoid improper language, the fact is that the court's admonitions, however strongly worded, carry no legal consequence. If the multiple uses of improper language in this case do not suffice to establish even one RJA violation, why would similar uses of such language in future cases be any different? The court's exhortations fall short of the jurisprudence the Legislature envisioned when it deemed "intolerable" racial bias "in any form or amount, at any stage of a criminal trial" (Stats. 2020, ch. 317, § 2, subd. (i)), and when it called on courts to turn the page on "only address[ing] racial bias in its most extreme and blatant forms" (*id.*, subd. (c)).

Further, the court's reasoning in this case and others filed today employ an analytical approach that threatens to significantly dilute the RJA's prohibition on language that "implicitly appeals to racial bias." (Pen. Code, § 745, subd. (h)(4).) In discussing the guilt-phase closing argument in which the prosecutor said comparing Barrera to "an animal"

would "insult animals," today's opinion says "[w]e need not . . . decide whether an objective observer would regard the prosecutor's [argument] as invoking implicit racial bias — as opposed to invoking jurors' sense of revulsion to the defendant's treatment of his child, in a manner unconnected to race." (Maj. opn., *ante*, at pp. 84–85.) But why can't both be true? The court's framing of the dichotomy — asking whether an objective observer would regard the prosecutor's argument as "invoking implicit racial bias[,] . . . *as opposed to* invoking jurors' sense of revulsion" (italics added) — fundamentally misapprehends the nature of implicit bias and why the Legislature sought to prohibit language appealing to such bias.

It will almost always be the case that language that activates implicit bias comes in "a form of camouflage" with a non-racial " 'descriptive' " meaning or purpose. (Dis. opn. of Evans, J., *post*, at p. 19.) Such language is typically neutral on its face and contains no explicit appeal to racial bias. It activates *implicit* bias because the plausibly neutral meaning of the language is not its only meaning. (See *People v. Chhuon and Pan* (June 1, 2026, S105403) __ Cal.5th __, __ [p. 6] (conc. & dis. opn. of Liu, J.) [prosecutor's appeal to religion in " 'making the point that despite Chhuon's difficult childhood, Marith did his best to raise Chhuon' " does not negate the fact that the prosecutor used language that appeals to bias; "Both things can be true"].) Animal comparisons are not any less evocative of pernicious minority stereotypes when "the comparison is also used to describe the defendant's criminal behavior." (Dis. opn. of Evans, J., *post*, at p. 19; see *People v. Demolle* (June 1, 2026, S159120) __ Cal.5th __, __ [p. 2] (conc. & dis. opn. of Liu, J.) ["To be sure, the prosecutor used the phrase ['wolf in sheep's clothing'] to describe Demolle's 'deceptive human actions.'

3

[Citation.] But it is unmistakable that the prosecutor also used it to convey that Demolle acted with animalistic savagery."].) Similarly, it can be said that "illegal alien" is a facially neutral term. (Cf. maj. opn., *ante*, at p. 79, fn. 10.) But it is also true that repeated use of the term to paint particular groups in a negative light has left a durable residue of automatic mental associations and invidious stereotypes. (E.g., Kurdi et al., *Cognitive Underpinnings and Ecological Correlates of Implicit Bias Against Non-Americans in the United States* (2025) 15 Sci. Rep. 15191.)

In today's cases, the court uses "either-or" reasoning when "both-and" is called for. This portends a serious watering down of the RJA. The court's "[p]arsimony" in applying the RJA (*Bankston, supra,* __ Cal.5th at p. __ [p. 3] (conc. opn. of Liu, J.)) does not sufficiently "consider evidence of racism's origins, insidious shifts, and current manifestations" (Stats. 2025, ch. 721, § 1, subd. (d)), or the Legislature's finding that "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias" (Stats. 2020, ch. 317, § 2, subd. (i)).

Since enacting the RJA in 2020, the Legislature has already found it necessary to strengthen the statute. (Stats. 2025, ch. 721.) If courts continue to dilute the RJA's "expansive aims through narrow construction" (*Bankston, supra,* __ Cal.5th at p. __ [p. 3] (conc. opn. of Liu, J.)), the Legislature may well consider whether it is necessary to amend the statute again in order to effectuate its intent.

**LIU, J.**

4

PEOPLE v. BARRERA

S103358

Dissenting Opinion by Evans, J.

The Legislature enacted the California Racial Justice Act
of 2020 (RJA) (Stats. 2020, ch. 317) with the stated purpose of
"eliminat[ing] racial bias from California's criminal justice
system" and "to ensure that race plays no role at all in seeking
or obtaining convictions or in sentencing." (Stats. 2020, ch. 317,
§ 2, subd. (i).) The bill's legislative findings cited the United
States Supreme Court's decision in *McCleskey v. Kemp* (1987)
481 U.S. 279, 295–299, as "the prime example that '[e]xisting
[judicial] precedent' . . . accepts racial disparities in our criminal
justice system as inevitable.' " (*Young v. Superior Court of
Solano County* (2022) 79 Cal.App.5th 138, 150, quoting Assem.
Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (f) (Assembly
Bill 2542). And, the Legislature adopted as its own the famous
line from the *McCleskey* dissent — that refusal to recognize
claims of widespread racial discrimination may express nothing
more than a "fear of too much justice." (*McCleskey*, at p. 339
(dis. opn. of Brennan, J.); see Assem. Bill 2542, § 2, subd. (f).)

In this case, and other cases interpreting the RJA issued
concurrently, *People v. Bankston* (June 1, 2026, S044739) ___
Cal.5th ___ (*Bankston*), *People v. Chhuon and Pan* (June 1,
2026, S105403) ___ Cal.5th ___, and *People v. Demolle* (June 1,
2026, S159120) ___ Cal.5th ___, the court falls short of the
Legislature's call to action. It adopts narrow constructions and
offers restrictive analyses that conflict with the RJA's
unambiguous textual commands and legislative history.

1

Instead of confronting and remedying the numerous problematic and harmful comments that pervaded defendant Marcos Esquivel Barrera's trial, the majority offers only tentative, and nonbinding, advice that future litigants should consider avoiding the discriminatory rhetoric deployed therein. And instead of rejecting a "fear of too much justice" as a guiding principle of the RJA, as the Legislature exhorted, the majority seems to embrace atextual limitations arising from fear of widespread impact.

I have written separately in *Bankston*, *supra*, ___ Cal.5th. ___ (conc. opn. of Evans, J.) [pp. 1–26] regarding my disagreement with the court's adoption of a harmless error standard for RJA violations. Such a construction conflicts with the statute's text, its codified findings, and unambiguous evidence of legislative intent — all of which dictate that remedies are required for *all* violations of the RJA, because bias in our criminal justice system is "never minor or harmless." (Stats. 2025, ch. 721, § 1, subd. (e).) Here, as conceded by the Attorney General, I underscore that the racially[1] charged, discriminatory, and dehumanizing language that pervaded this case violated the RJA.

The Legislature could not have been clearer: "Because use of animal imagery is historically associated with racism, use

---

[1] As the majority recognizes, the RJA, which prohibits "racially discriminatory language" in criminal trials, (Pen. Code, § 745, subd. (a)(2), refers "not only to bias based on race, but also to bias based on ethnicity or national origin, consistent with the overarching prohibition in subdivision (a)." (Maj. opn., *ante*, at p. 71, fn. 9.) Like the majority and the Legislature, this opinion refers to instances of discrimination based on ethnicity and national origin under the general rubric of "racial discrimination."

of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Stats. 2020, ch. 317, § 2, subd. (e).) The prosecutor in this case not only compared Barrera to an animal, she did so in the most dehumanizing manner possible, declaring "I would like to say that he's an animal, but I would not insult animals. And for sure he's not a human because I don't want to belong to the same specie[s] he does. What is he? He's evil. Evil in the shape of a man." During the penalty phase, the prosecutor employed additional implicitly discriminatory language. In summation, the prosecutor reinvoked the dehumanizing comparison of Barrera to an animal. Simultaneously, the prosecutor appealed to the jury for a death sentence by contrasting the conduct of "we the citizens" with that of Barrera — an undocumented immigrant whose citizenship status had been highlighted repeatedly throughout the trial despite its irrelevance.

I do not question the strong evidence that supports Barrera's guilt or that his conduct towards his family was shocking and reprehensible. But a defendant's conduct, no matter how egregious, is not an exemption from the Legislature's command that trials must be free from the taint of discrimination. The majority, by merely assuming error, fails to remedy bias in a case that is a paradigmatic example of the sort of implicitly discriminatory language the Legislature sought to excise from criminal trials. Further, the majority's statements, suggesting that the merits of the violations here are perhaps doubtful, will do much to sow confusion regarding the application of the RJA in future cases.

The majority's approach, assuming error, but finding it harmless, is not merely an incorrect interpretation of the statute. This method of legal analysis, which no doubt will be

repeated in future cases, undermines the Legislature's explicit instruction that courts confront each instance of racial bias infecting criminal proceedings. The RJA "mandates that we face that racial bias exists in our criminal legal system, and that we remedy it." (Stats. 2025, ch. 721, § 1, subd. (e).) The majority's opinion does neither. I therefore respectfully dissent.

## I.

The RJA prohibits the use of "racially discriminatory language" (Pen. Code,[2] § 745, subd. (a)(2)), which the Legislature has defined as including "racially charged or racially coded language" and "language that compares the defendant to an animal." (§ 745, subd. (h)(4).) This case includes both, and the Attorney General rightly conceded a violation of the RJA, both in briefing and at oral argument. The statements that form the basis of the Attorney General's concession, discussed below, are patent violations of the RJA. Although assuming error, the majority suggests the possibility that denigrating guilt-phase animal comparisons may have been wholly "unconnected to race" and that penalty phase error is "not clear," offering that an objective observer "would" interpret the problematic penalty phase arguments, at least in part, in a nondiscriminatory manner. (Maj. opn., *ante*, at pp. 85, 94–95) Although these musing are merely dicta, as the opinion ultimately rests on the harmlessness of any assumed errors (see *ibid*.), I disagree with any suggestion that the comments at issue here did not violate the RJA.

---

[2] Subsequent statutory references are to the Penal Code.

## A.

The majority correctly recognizes that the RJA "extends to facially neutral language that implicitly appeals to racial bias, not just uses of racial epithets or overtly racial overtures" and requires an examination "sensitive to context." (Maj. opn., *ante*, at p. 78.) An overview of the whole context of this case confirms that an "objective observer" would view the comments as racially discriminatory. (§ 745, subd. (h)(4).)

Barrera argues that his trial was "racialized from beginning to end," citing numerous instances in which prospective jurors, defense counsel, a defense expert, and the prosecution employed implicitly or explicitly offensive stereotypes or otherwise discriminatory language. Some of these instances do not themselves establish RJA violations. However, surveying the record holistically substantiates Barrera's claims and the Attorney General's concessions.

As a starting point, the Legislature has specified its intention "that in applying the RJA, courts consider evidence of racism's origins, insidious shifts, and current manifestations." (Stats. 2025, ch. 721, § 1, subd. (d).) This requires courts assessing violations of the RJA to consider not only the larger context of the trial, but that of history. As the amicus curiae brief of the Mexican government reminds us, "[d]iscrimination against Mexicans on the basis of their ethnicity and national origin has deep roots in California." Vigilantes hanged, burned, and shot thousands of persons of Mexican descent in the United States, and the scale of mob violence against Mexicans "far exceeds the violence exacted on any other immigrant group and is comparable, at least on a per capita basis, to the mob violence suffered by African Americans." (Carrigan & Webb, Forgotten Dead: Mob Violence Against Mexicans in the United States,

1848–1928 (2013) pp. 1–2.) After lynchings subsided, other brutal treatment surfaced. In the 1930s, local governments and authorities "forcibly removed approximately 1.8 million people from the United States whom they *suspected* to be of Mexican descent. Nearly 60 percent of those removed were United States citizens." (*State v. Zamora* (2022) 199 Wn.2d 698, 720 [512 P.3d 512] (*Zamora*).) The largest mass deportation in American History occurred in 1953 and was derogatorily named "Operation Wetback." (Johnson, *Trump's Latinx Repatriation* (2019) 66 UCLA L.Rev. 1444, 1460; see *id.* at pp. 1460–1464.)

Disparate treatment and animus towards Latino immigrants is not an irrelevant relic of the past. To the contrary, discrimination against Latino immigrants, and Latinos generally, persists in California. (See, e.g., Stats. 2020, ch. 92, § 1, subd. (b) [legislative findings that Latino Californians are "overpoliced, have higher rates of convictions following an arrest, and have the highest rates of poverty"].) Particularly salient to this case are negative caricatures of Latinos as inherently criminal. (See Romero, *State Violence and the Social and Legal Construction of Latino Criminality: From El Bandido to Gang Member* (2001) 78 Denv. U. L.Rev. 1081.) Biased stereotyping of Latinos is compounded by xenophobic reactions to crime by immigrants and, in particular, Latino immigrants. Media coverage in criminal cases routinely places great attention, often sensationalistic, on defendants' legally irrelevant undocumented status. Indeed, as the Mexican government describes, this occurred in Barrera's case and has occurred in other capital cases involving Mexican nationals. The negative stereotypes bolstered by such scrutiny have real-world effects. According to one study, a group of California venire persons presented with identical case facts were nearly

twice as likely to find the defendant guilty if he was an impoverished and undocumented Mexican, compared to an undocumented White Canadian of higher social status. (Espinoza et al., *The Impact of Ethnicity, Immigration Status and Socioeconomic Status on Juror Decision Making* (2015) 13 J. Ethnicity in Criminal Justice 197, 203 (Espinoza).)  The same study found that White jurors are likely to more harshly sentence poor Latinos than poor Whites.  (*Ibid.*)

Although the majority underscores that examination of context is required, the opinion gives relatively short shrift to some of the problematic statements made during Barrera's trial. And it gives no consideration to the attendant effects these statements could have on the perceived meaning of *other* statements for which RJA violations are alleged and for which the Attorney General concedes error.

For instance, during voir dire, Mexican immigrants, such as Barrera, were referred to as "illegal aliens," a "flood of non-European immigrants" who are a "burden" on society, and the subject of "resent[ment]" by United States citizens.  In rejecting Barrera's argument that prospective jurors' explicitly biased statements discussed in voir dire did not violate the RJA, the majority briefly concludes that these statements themselves are not cognizable under section 745, subdivision (a)(2), which are directed at statements of "jurors" and not "*prospective* jurors." (Maj. opn., *ante*, at p. 73.)  In light of the specific context of this case, in which the prospective jurors who made the discriminatory statements were appropriately excused for cause, it may be that there was an insufficient "risk that the prospective jurors' confessions of bias would have encouraged bias in others" to establish a violation of the RJA.  (Maj. opn., *ante*, at p. 74.)  However, when explicitly biased statements are

recited in open court, and before potentially seated jurors, courts analyzing claims under the RJA should remain vigilant that such comments may contribute to the racially charged atmosphere of proceedings.

Prospective jurors perceived as Latino were also singled out by codefendant's counsel for disparate questioning about whether they could remain impartial based on their ethnicity. The majority rightly "do[es] not condone" targeting jurors by perceived ethnicity to inquire whether they would be too " 'anger[ed]' " or " 'embarrass[ed]' " due to their shared ethnic identity to sit as impartial triers of fact. (Maj. opn., *ante*, at pp. 76, 74.) But it does not simultaneously acknowledge that questions which assume that a racial or ethnic group might be held responsible for the actions of one of their members have *implicit* effects. Such stereotyping tends to frame the legal inquiry in a criminal trial — one that is intended to focus on individual culpability — along legally irrelevant racial or ethnic lines. Any line of questioning that encourages jurors, even implicitly, to employ such "race-based reasoning" is improper. (*People v. Gomez* (2018) 6 Cal.5th 243, 311 (*Gomez*).)

The majority also highlights concerns about Barrera's counsel's use of the term "illegal alien" during voir dire questioning and acknowledges that the term "may evoke racial bias in certain contexts." (Maj. opn., *ante*, at p. 79.)[3] In

---

[3] The majority notes that not every use of the term "illegal alien" is implicitly discriminatory (maj. opn., *ante*, at p. 79 & fn. 10) and suggests that the "time and the context" of a "2001 trial" support a finding of no violation from these comments. (Maj. opn., *ante*, at p. 79.) However, defense counsel himself admitted that the question, concerning prejudice against "illegal aliens," was "unfair" and rephrased it to excise reference to the charged

concluding that no violation is established, the majority appropriately takes into account the relevant (though, importantly, not determinative) fact that defense counsel's efforts were intended "to ensure that no prospective juror harbored impermissible biases against his client based on his status as an undocumented Mexican immigrant." (Maj. opn., *ante*, at p. 79.) However, again, the majority fails to weigh the implicit effects that the use of this term, in the pejorative, would have on the environment in which later comments were received.

As the high court has recognized, questioning on racial bias may " 'exacerbate whatever prejudice might exist without substantially aiding in exposing it.' " (*Peña-Rodriguez v. Colorado* (2017) 580 U.S. 206, 224–225.) When charged and potentially discriminatory language about illegal immigration is employed during voir dire, there is a heightened risk of triggering latent prejudice. (*State v. Zamora, supra,* 512 P.3d at p. 520 ["[T]here is an increased danger of infecting the jury with bias and prejudice when the improper conduct occurs at the jury's . . . introduction to the case, the courtroom, the proceedings, and their responsibility as a member of a jury. The

---

term. Thus, the context here indicates that counsel, prospective jurors who heard the question, and any objective observer would be aware of the pejorative and implicitly discriminatory meaning of the term. The era in which a term is used may, at times, change its meaning. But we should not subtly condone past uses of racially charged or coded language, recognized as such by the speaker here, simply because others have gained sufficient wisdom over the years to refrain from using such potentially offensive terminology in open court. (*Bankston, supra,* ___ Cal.5th. ___ [pp. 106–107) [discussing prosecutor's implicitly discriminatory use of the racially charged term "thug"].)

jury is, in the voir dire phase, primed to view the prosecution through a particular prism"].) It is therefore important to recognize that statements to and by prospective jurors, though not necessarily themselves substantiating a violation of the RJA, may heighten the discriminatory impact of subsequent statements which, on their own, may appear "facially neutral." (Maj. opn., *ante*, at p. 78; see also *Zamora*, at p. 520 [noting that when a jury is primed with charged or discriminatory language concerning illegal immigrants during voir dire "the jury becomes infected in untraceable ways"].)

The guilt phase of the trial contained at least some comments that served to reinforce the problematic focus on Barrera's ethnicity and nationality initiated during voir dire. As the majority recounts, there were repeated references to Barrera's street-vending operation, including mocking references to Barrera as the " 'big boss' " and an " 'enterprising man' " and codefendant's counsel's statement that Barrera brought Petra Ricardo and her children to the United States because " 'he needs a bigger labor force.' " (Maj. opn., *ante*, at pp. 81, 82.) On balance, the majority may be correct that these comments were directed at Barrera's abusive treatment of his children, and not his nationality or legal status. However, particularly with respect to the comment regarding recruiting his children from Mexico as a needed "labor force," it is not difficult to see an implicit and evocative connection between Barerra's situation and the unfavorable view towards Mexican immigrants already introduced, repeatedly, to the prospective jurors during voir dire.

At the conclusion of guilt proceedings, during closing summation, the prosecutor made a dehumanizing comparison of Barrera to an animal. The prosecutor told the jury, "I don't even

know what to call this man. I would like to say that he's an animal, but I would not insult animals. And for sure he's not a human because I don't want to belong to the same specie[s] he does. What is he? He's evil. Evil in the shape of a man." It is with both this comment, and the entire context of the case up to this point, that we must examine whether, as the Attorney General concedes, the prosecutor violated the RJA during closing summation at guilt.

The penalty phase continued the trial's troubling focus on Barrera's immigration status and again included charged and potentially discriminatory language. As the majority recounts, Barrera's cultural expert witness opined that being " 'illegal' " was a risk factor that predisposed Barrera to commit child abuse. (Maj. opn., *ante*, at p. 88, see *id*. at p. 89.) This problematic testimony led, in turn, to prosecutorial cross-examination, which amplified attention on this point, including repeated references to Barrera being an " 'illegal immigrant.' " (*Id*. at pp. 89–90.) As the majority details, in the challenged portions of the trial transcript, both the defense expert and the prosecutor used the terms " 'illegal alien' " and " 'illegal immigrant' " to refer to Barrera's immigration status, and the prosecutor's cross-examination elicited from the expert that " 'being [*sic*] illegal immigrant makes it more likely to beat your children.' " (Maj. opn., *ante*, at p. 93; see *id*. at p. 90.)

The majority declares that these facts bear no similarity at all to the United States Supreme Court case *Buck v. Davis* (2017) 580 U.S. 100. I am less confident. In *Buck*, as in this case, a defense expert testified that a particular group, in that case Black people, was, as a statistical matter, predisposed to be more violent. (*Id*. at p. 104.) Although the expert in *Buck* suggested that the defendant's race made a finding of future

dangerousness more likely, and the expert's point here was that Barrera's nationality was a stressor and was mitigating, it is far from clear that this distinguishes *Buck*. While the logic here was employed as a mitigating strategy, rather than a concession of some degree of aggravation as in *Buck*, defense experts in both trials were presenting mitigating cases. Regardless of whether such evidence is presented in aggravation or mitigation, overly simplistic race-based statistical characterizations pose a significant risk of being misunderstood by jurors and thus invite wholly impermissible "race-based reasoning." (*Gomez, supra*, 6 Cal.5th at p. 311.)

In evaluating the defense expert's testimony on cross-examination, the majority analyzes what the "aim[]" of the prosecutor's questioning was, or what she was "trying to" accomplish. (Maj. opn., *ante*, at p. 92.) Under the RJA, this cannot be the central focus because the RJA targets the use of discriminatory language "whether or not purposeful." (§ 745, subd. (a)(2). Thus, the RJA demands reviewing courts consider whether a trial that includes statements such as "being [an] illegal immigrant makes it more likely to beat your children" (Maj. opn., *ante*, at p. 90) is one in which there is language that "*implicitly* appeals to racial bias" regardless of the prosecutor's intent. (§ 745, subd. (h)(4), italics added.)

Setting aside whether the defense expert's testimony on direct and cross-examination itself violated the RJA, the majority's analysis fails to acknowledge the spill-over effects of the entire exchange. At a bare minimum, this testimony placed undue focus on the irrelevant fact of Barrera's immigration status. And, perhaps equally important, it served to frame later prosecutorial comments on citizenship during penalty phase summation.

Given this entire context, when the prosecutor ultimately contrasted the behavior of "We, the people of the state of California, we the citizens," and "we, the citizens of the United States," to that of Barrera, the stage had been set. The jury had already been primed, repeatedly, to view Barrera through the lens of his ethnicity and nationality. Thus, there is little question that these comments could, and would, "be understood as gratuitously calling attention to the differences between citizens and noncitizens." (Maj. opn., *ante*, at p. 95; see also Stats. 2025, ch. 721, §1, subd. (c) [highlighting that the RJA was meant to address cases in which there were "gratuitous references to nationality, race, or immigration status"].) A reading of the prosecutor's statements here as constituting implicit discrimination is particularly apt when the prosecutor's comments to the jury as "we the citizens" are considered in context — followed by an immediate comparison of Barrera to an animal, harkening back to the prosecutor's dehumanizing guilt phase summation.

## B.

Even without the extensive context detailed above, I would find that the prosecutor's comparisons of Barrera to an animal runs afoul of the RJA's prohibition of discriminatory language. (§ 745, subds. (a)(2), (h)(2).) We have held in *Bankston* that the RJA forbids "some" comparisons between a defendant and an animal, but that "we are unpersuaded that the RJA categorically prohibits *all* such language," given that "not all uses of animal imagery raise concerns about explicit or implicit appeals to racial bias." (*Bankston*, *supra*, ___ Cal.5th at p. ___ [pp. 100–101], original italics.) Neither the opinion in *Bankston* nor the majority opinion in this case fully grapples

13

with the legislative text or the accompanying legislative findings in a manner which provides a clear and administrable test for evaluating whether animal comparisons violate the RJA.

The RJA's text itself singles out animal comparisons of criminal defendants as implicitly discriminatory. As defined by the RJA, " '[r]acially discriminatory language' " includes "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, *language that compares the defendant to an animal*, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4), italics added.) The legislative findings support a broad, rather than a narrow, construction of this prohibition, indicating that "[b]ecause use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant *is racially discriminatory and should not be permitted in our court system*." (Stats. 2020, ch. 317, § 2, subd. (e), italics added.)

This legislative finding is categorical in nature. However, the majority, relying on *Bankston*, rejects a "categorical reading," of section 745, subdivision (h)(4), hypothesizing that at least some animal comparisons, such as " 'eager beaver,' 'happy as a clam,' 'free as a bird,' or 'quiet as a mouse' " are wholly inoffensive such that "none would appear to raise racial discrimination concerns." (Maj. opn., *ante*, at p. 83.)

This analysis is superficial, at best. To be sure, the Legislature did not intend to prohibit such obviously nondiscriminatory comparisons to beavers, birds, and clams. But does that mean that this broad finding was drafted, in

categorical terms, by mistake? I am doubtful. The more reasonable explanation is that the Legislature used expansive language because it believed that the vast majority of cases in which criminal defendants of color were compared to animals were instances of implicit discrimination. By offering that the offensive animal comparison in Barrera's case may merely demonstrate "revulsion" towards the defendant "unconnected to race" (maj. opn., *ante*, at p. 85), the majority suggests the opposite. If even the starkly dehumanizing language in this case does not qualify as "discriminatory language" under section 745, subdivision (h)(4), most, if not all, animal comparisons actually utilized by prosecutors would seem to be fair game, notwithstanding the Legislature's clear intent to the contrary.

A careful inspection of the particular legislative finding discussing animal comparisons reveals the Legislature's intended meaning. In making the statement that the use of animal imagery to describe a defendant "is racially discriminatory" (Stats. 2020, ch. 317, § 2, subd. (e)), the Legislature cited two scholarly articles: Prasad, *Implicit Racial Biases in Prosecutorial Summations: Proposing an Integrated Response* (2018) 86 Fordham L.Rev. 3091 (Prasad) and Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences* (2008) 94 Journal of Personality and Social Psychology 292 (Goff). (Stats. 2020, ch. 317, § 2, subd. (e).)

Prasad's article explains that *dehumanizing* animal comparisons are the source of implicit racial bias in prosecutorial summation. Such "[d]ehumanization reduces white persons' empathy" for people of color "which could explain why violent crimes against white victims typically trigger harsher punishments than crimes against people of color,

particularly when the offender is Black and the victim is white." (Prasad, *supra,* 86 Fordham L.Rev. at p. 3105.) "By using similes that do not explicitly allude to race but conjure up stereotypes of Black people as having animalistic tendencies or behaving like an animal would, prosecutors can conjure up violent images about the defendant in jurors' minds." (*Id.* at pp. 3105–3106.)

Goff's article similarly focuses on the implicitly discriminatory effect of dehumanization, recounting its role, particularly against Black Americans, as a central feature of the history of racism in America. (Goff, *supra*, 94 J. Personality and Social Psychology at p. 292.) More specifically, Goff details the mechanism of dehumanization and how it impacts its targets. Goff explains, "Dehumanization is viewed as a central component to intergroup violence because it is frequently the most important precursor to moral exclusion, the process by which stigmatized groups are placed 'outside the boundary in which moral values, rules, and considerations of fairness apply.'" (*Id.* at p. 293.) "Groups that are morally excluded do not count in a moral sense. Consequently, anything that is done to someone who is morally excluded is permissible, no matter how heinous the action." (*Ibid.*)

The application of these psychological dehumanization principles to capital cases such as this one is straightforward. One of the studies in Goff's article examined a data set of death-eligible cases and explored newspaper coverage of those cases, demonstrating that "Black defendants who were put to death were more likely to have apelike representations in the press" and that "Black defendants are more likely to be portrayed as apelike in news coverage than White defendants and that this portrayal is associated with a higher probability of state-

sponsored executions." (Goff, *supra*, 94 Journal of Personality and Social Psychology at p. 304.) Prasad's article contains a lengthy description of a capital case in which the defendant was dehumanized in various ways by the prosecutor, including comparing him to a "monster," "caveman," and a "beast of burden," and "King Kong." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3093; see also *Bennett v. Stirling* (4th Cir. 2016) 842 F.3d 319, 327–328 [reversing capital sentence based on discriminatory prosecutorial misconduct.) But Prasad's criticism was not limited to the racist trope of the black ape. In articulating how animal comparisons can evoke implicit bias, the article cites the United States Supreme Court's decision in *Darden v. Wainwright* (1986) 477 U.S. 168, 192 and its acceptance of a death penalty summation in which the prosecutor described the defendant as an " 'animal' " who " 'shouldn't be [let] out of his cell unless he has a leash on him.' " (Prasad, at p. 3106, fn. 141.)

In short, the Legislature's citation to these articles reveals that the prohibition of animal comparisons with implicitly racist impact is not limited to any specific discriminatory caricature — calling Jewish people "rats" or Black people "apes" or "Bengal tigers" — but flows from the dehumanization of the defendant through animal comparisons more generally. Such comparisons invite moral exclusion by the decision maker, placing those stigmatized by the comparison outside of normal moral boundaries. (Conway, *Are There Stories Prosecutors Shouldn't Tell?: The Duty to Avoid Racialized Trial Narratives* (2021) 98 Denv. L.Rev. 457, 469, citing Goff, *supra*, 94 J. Personality and Social Psychology at p. 293.) If a prosecutor successfully " 'out-groups' " the defendant in this manner, "jurors may feel that the defendant is not entitled to the same

legal or constitutional protections that an insider would be," for example, by "unconsciously lower[ing] the burden of proof" or changing their assessment of witness credibility. (Conway, at p. 474.) The prosecutor's statements here are a quintessential example of dehumanization and moral exclusion through implicitly discriminatory animal comparisons that the RJA seeks to abolish.

I fear that a test that does not prohibit all dehumanizing animal comparisons of defendants of color will prove unadministrable and will collapse into prior law. The Legislature, by citing Prasad, recognized the shortcomings of then-existing law: "[c]ourts often argue that subtle references are 'merely descriptive' and are unwilling to recognize the impact the references could have on jurors' implicit biases" and therefore "do not fully appreciate the unfair impact the references could have on jurors' implicit biases." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3115.) Indeed, the flawed framework of our own case law was specifically identified by the Legislature. We stated in *People v. Powell* (2018) 6 Cal.5th 136 that "[i]t goes without saying that a prosecutor may not compare a defendant to a beast for the purpose of dehumanizing him before the jury or in an effort to evoke the jury's racial biases." (*Id.* at p. 183.) However, in *Powell*, we nonetheless reasoned that comparison of the defendant to a Bengal tiger was merely an attempt to "properly remind a penalty phase jury of the circumstances of the offense, including the brutality of the murder, and caution the jury against judging defendant solely based upon his calm demeanor in the courtroom." (*Ibid*.) The Legislature, in passing the RJA, specifically called out the deficiency of our decision in *Powell* as one in which courts

improperly "tolerate[d] the use of racially incendiary or racially coded language." (Stats. 2020, ch. 317, § 2, subd. (e).)

The majority, however, seems to suggest that the basic logic in *Powell* still survives. Much like *Powell*'s reading of the Bengal tiger story as merely commentary on the "brutality of the murder," the majority offers that the prosecutor's statements here, describing Barrera as less-than-animal, might merely "invok[e] jurors' sense of revulsion to the defendant's treatment of his child." (Maj. opn., *ante*, at p. 85.) The problem with this reading is that implicitly discriminatory animal comparisons virtually always serve dual purposes. The manifestation of implicit racial bias "is difficult to detect and, even when detected, is capable of racially neutral interpretations." (Prasad, *supra*, 86 Fordham L.Rev. at p. 3094.)

Courts such as *Powell* only condoned implicitly discriminatory animal comparisons because they contained a form of camouflage: their "descriptive" purpose. Such comparisons are not merely descriptive, however. They draw on a long history of racism that allows animal comparisons "that do not explicitly allude to race" to evoke stereotypes of defendants of color "having animalistic tendencies or behaving like an animal would." (Prasad, *supra*, 86 Fordham L.Rev. at pp. 3105, 3106; see also Alford, *Appellate Review of Racist Summations: Redeeming the Promise of Searching Analysis* (2006) 11 Mich. J. Race & L. 325, 347 [discussing different techniques used by prosecutor's to "associate the defendant with the particular stereotype of animalistic ferocity without making use of explicitly racist language"].) Thus, it should be no defense to a claimed RJA violation to assert, as the majority here hints, that the comparison is also used to describe the defendant's criminal behavior. The ultimate focus must be on whether the

comparisons serve to dehumanize the defendant, thereby drawing on latent stereotypes which activate bias against the defendant. (Prasad, at p. 3101 & fn. 94.)

## C.

The majority opinion repeatedly acknowledges that something was amiss in this trial. Most obviously, the court explicitly states with respect to the guilt-phase animal comparison: "we do not approve the prosecutor's comments," that they were "inappropriate" and that "we now make clear that such language should not be used going forward." (Maj. opn, *ante*, at p. 84; see also *id.* at p. 87 ["we have made clear that the prosecutor's animal comments at closing argument were improper"].) The majority also states that "we do not condone the manner in which [codefendant's] counsel conducted the questioning" in voir dire (*id.* at p. 76), that the trial included terminology that "may evoke racial bias in certain contexts" and that counsel inquiring about prejudice towards " 'illegal aliens' " might have "worded his question differently if he were asking it today." (*Id.* at pp. 78, 77, 79.) As to the penalty phase arguments, the majority again notes that the parties "might have used different language were trial held today" and that we "strongly caution counsel against using language that gratuitously calls attention to the citizenship status of noncitizens." (*Id.* at pp. 93, 94.) It also accepts that the penalty phase argument "could be understood as gratuitously calling attention to the differences between citizens and noncitizens" and recognizes that these comments were "swiftly followed by language comparing Barrera's actions to those of an animal." (*Id.* at p. 95.) Finally, it "reiterate[s]" that "language that

negatively compares a defendant to an animal, or that otherwise seeks to dehumanize the defendant, is improper." (*Id.* at p. 94.)

Yet, despite recognition of manifest impropriety, the majority stops short of finding any violation of the RJA, merely assuming them. I am concerned that its guidance is merely advisory and, at most, prospective. This incrementalist approach, affecting only postenactment cases, was not what the Legislature intended. (See Stats. 2022, ch. 739, § 1 ["It is the intent of the Legislature to apply the California Racial Justice Act of 2020 retroactively, to ensure equal access to justice for all"].)

## II.

As I have set forth in my concurring opinion in *Bankston*, *supra*, ___ Cal.5th. ___ (conc. opn. of Evans, J.) [pp. 1–26], the RJA's remedies are mandatory. As the Legislature dictated in enacting this law, "no degree or amount of racial bias is tolerable in a fair and just criminal justice system" (Stats. 2020, ch. 317, § 2, subd. (h)) "because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California." (Stats. 2020, ch. 317, § 2, subd. (i).) Because the Attorney General has properly conceded a guilt-phase violation of the RJA, the only appropriate remedy is to reverse both Barrera's conviction and sentence. (§ 745, subd. (e)(2)(A).)

Assuming, however, that a harmlessness standard applies, the majority's analysis that there is no conceivable prejudice as to the penalty verdict is incomplete and incorrect. In its brief analysis of prejudice, the majority reasons that the

case in aggravation was "strong" and the mitigation offered by Barrera was "weak." (Maj. opn., *ante*, at p. 96.) Although acknowledging that appeal to implicit racial bias "warrants especially careful scrutiny" because jurors must weigh "character in the balance of aggravating and mitigating circumstances" the opinion accepts that there is no possibility of prejudice. (Maj. opn., *ante*, at p. 103; see also *id.* at p. 98.) Yet it does so without even identifying the harmful effects of the implicitly discriminatory comments at issue.

No one can dispute the trial court's assessment that the circumstances of this crime were horrendous. But this does not answer the question presented in the stringent test articulated in *Chapman v. California* (1967) 386 U.S. 18, adopted by the majority for RJA violations. (Maj. opn., *ante*, at p. 85.) That standard "requires reversal unless it appears ' "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*People v. Schuller* (2023) 15 Cal.5th 237, 261.) In turn, such analysis requires that reviewing courts grapple with the *effects* of implicitly discriminatory language on fact finders and sentencers. (*Bankston*, *supra*, ___ Cal.5th. ___ (conc. opn. of Evans, J.) [pp. 28–30].) As in *Bankston*, however, the majority opinion here "lacks an explanation of racism's effects on a criminal trial" and fails to "account for the way in which an appeal to racial bias skews decisionmaking, including the moral and normative sentencing function." (*Bankston*, *supra*, ___ Cal.5th. ___ (conc. opn. of Evans, J.) [p. 28].)

The scientific research invoked in the RJA's legislative findings indicates that dehumanizing animal comparisons, such as those present in this case, place defendant " 'outside the boundary in which moral values, rules, and considerations of fairness apply' " (Goff, *supra*, 94 J. Personality and Social

Psychology at p. 293), causing jurors to be less likely to afford sympathy and more likely to impose harsher punishments. (Prasad, *supra*, 86 Fordham L.Rev. at pp. 3105, 3107.) Moreover, implicit bias, is "particularly likely to influence capital juries' choice of punishment." (*Bankston*, *supra*, ___ Cal.5th. ___ (conc. opn. of Evans, J.) [p. 31].) Of unique import to this case, research demonstrates that jurors are more likely to impose harsher punishments on undocumented Mexican immigrants. (See Espinoza, *supra*, 13 J. Ethnicity in Criminal Justice at p. 206 [jurors more likely to assign no-parole sentence to undocumented Mexican defendants].) In the capital context specifically, studies have shown that jurors are more likely to report that mitigators did not outweigh aggravators and recommend a death sentence when the defendant was an undocumented immigrant. (See Alvarez & Miller, *How Defendants' Legal Status and Ethnicity and Participants' Political Orientation Relate to Death Penalty Sentencing Decisions* (2017) 3 Translational Issues in Psychological Science 298, 303–305; West et al., *How mock jurors' cognitive processing and defendants' immigrant status and ethnicity relate to decisions in capital trials* (2021) 17 J. Experimental Criminology 423, 427 [jurors "more likely to report that mitigators did not outweigh aggravators when the defendant was an undocumented immigrant"].)

For errors at the penalty phase, a defendant must show only that the error "may have led a single juror to vote for the death penalty, who, if the error had not occurred, would not have done so." (*People v. Terry* (1964) 61 Cal.2d 137, 153; see *People v. Brown* (1988) 46 Cal.3d 432, 472, fn.1 (conc. opn. of Broussard, J.).) The entire purpose of the open-ended penalty phase, in which the individual character and entire background of a

defendant must be assessed, is to "maximize the jury's opportunity to see the defendant as a human being, with human frailties, and not merely as a dehumanized stranger." (*People v. Williams* (1989) 48 Cal.3d 1112, 1131.) But the nature of the error in this case — multiple implicitly discriminatory appeals to the jury, including in penalty phase summation — undermined any opportunity Barrera had to convince the jury of his humanity and to spare his life.

Given the tangible and documented effects of implicit bias on sentencing outcomes, the majority appears to assume that, notwithstanding these effects, a death verdict in a horrific case of child murder would be automatic. But this view is flawed, both as a matter of doctrine, and as a realistic assessment of capital juries' practices. Regardless of the severity of the underlying facts, a juror "is never *required* to vote for the death penalty." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 401; see also *Sumner v. Shuman* (1987) 483 U.S. 66, 75 [invalidating statute which mandated a death sentence for all murders committed by an inmate serving a life term].) Any assumption that a particular class of murders will necessarily receive the death penalty improperly treats defendants as an "undifferentiated mass to be subjected to the blind infliction of the penalty of death" instead of "uniquely individual human beings" who may be accorded recognition of "compassionate or mitigating factors stemming from the diverse frailties of humankind." (*Woodson v. North Carolina* (1976) 428 U.S. 280, 304.)

The high court's statements that a life verdict is possible no matter the facts in aggravation are not merely hollow invocations. Even in horrific capital cases involving multiple child victims, such as this one, jurors are still capable of issuing

life verdicts. (See Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases* (2018) 46 Hofstra L.Rev. 1161, 1229 [appendix collecting over 70 cases from 1979 to 2017 in which juries rejected death verdicts in cases with child victims].) A survey of the harrowing facts of these cases reveals that, even in trials uncovering the darkest incidents of violence, jurors are capable of recognizing capital defendants' humanity.

This Court, too, has recognized that even the terrible tragedy of child murder does not automatically foreclose a jury from according mercy to a capital defendant. In *People v. Nieves* (2021) 11 Cal.5th 404, the defendant murdered her four children by intentionally setting fire to their home. (*Id.* at p. 418.) In finding the trial court's repeated acts of disparaging trial counsel prejudicial, we recognized that "[a]bsent the trial judge's persistent, disparaging remarks" a juror might have "greater sympathy" for the defendant's circumstances and could have issued a life sentence. (*Id* at p. 506.)

Barrera's case in mitigation was unlike that presented in *Nieves*, but neither was it wholly insubstantial. (Cf. *Bankston*, *supra*, ___ Cal.5th ___ [p. 27] (conc. opn. of Evans, J.) [noting reversal due to implicitly discriminatory animal comparison despite mitigation case that "was virtually nonexistent"].) The majority characterizes Barrera's mitigation as "weak," and notes that both Barrera's father and uncle denied the existence of physical abuse against him as a child. (Maj. opn., *ante*, at p. 96, 97.) Other evidence, however, contradicted these claims. A defense expert report detailed that Barrera was physically abused by his father "on a regular basis." The report observed that the abuse was "substantial" and recounted an occasion

where Barrera's father whipped him with a horse whip. The report also documented that Barrera's siblings recounted that he was whipped by his father "severely on numerous occasions" with "anything that might be available," with his father "treating him as if he was an animal whose behavior needed to be 'broken.'" The report attempted to contextualize Barrera's own abuse of his children as an extension of the abuse he received as a child.[4]

A central feature of Barrera's presentation to the capital jury, present in virtually any penalty phase, was to illustrate that "he's a human being." Appeals to racial discrimination irrevocably infect jurors' innate capacity to see defendants' humanity, in ways that cannot be undone or accurately traced. (See, e.g., *Zamora, supra*, 512 P.3d at p. 525 [the prosecutor's "injection of racial discrimination [against immigrants] into this case *cannot be countenanced at all*, not even to the extent of contemplating to any degree that the error might be harmless"].)

The court provides no concrete evidence that the profound effects of implicit discrimination did not impact the jury's verdict. It therefore cannot demonstrate, beyond a reasonable doubt that the injection of racial bias into the penalty trial was harmless. I would reverse both the conviction and sentence. I therefore respectfully dissent.

**EVANS, J.**

---

[4] The majority suggests that the source of Peralta's information regarding Barrera's abuse as a child, and this information's reliability, is unclear. (Maj. opn, *ante*, at p. 97, fn.13.) The report indicates that the source of its information was Barrera's siblings and, as the majority notes, the report was introduced into evidence by the prosecution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Barrera

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S103358
**Date Filed:** June 1, 2026

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Ronald S. Coen

_____

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Alexander Post, Assistant Chief Counsel, Jessica K. McGuire, Assistant State Public Defender, Ellen J. Eggers, Erik Levin and William C. Whaley, Deputy State Public Defenders, for Defendant and Appellant.

James S. Thomson for the Government of Mexico as Amicus Curiae on behalf of Defendant and Appellant.

Claudia Van Wyk, Megan Byrne; Avram Frey and Neil Sawhney for the American Civil Liberties Union Foundation, the ACLU of Northern California, the ACLU of Southern California, the ACLU of San Diego and Imperial Counties, the Habeas Corpus Resource Center and the California Appellate Project-San Francisco as Amici Curiae on behalf of Defendant and Appellant.

Orrick, Herrington & Sutcliffe, Nathan D. Shaffer and Amanda H. Schwartz for Assemblymember Ash Kalra as Amicus Curiae on behalf of Defendant and Appellant.

Sean K. Kennedy and Priscilla Ann Ocen for the Center for Juvenile Law & Policy and the Loyola Anti-Racism Center at Loyola School of Law as Amici Curiae on behalf of Defendant and Appellant.

Shaleen Shanbhag; and Joseph Doyle for the Fred T. Korematsu Center for Law and Equality at the University of California, Irvine School of Law, the Center for Law, Equity and Race at Northeastern University School of Law, the Center on Law, Race & Policy at Duke University School of Law, the Center for Civil Rights and Critical Justice at Seattle University School of Law, the Center for Security, Race and Rights at Rutgers Law School, the Gibson-Banks Center for Race and the Law at the University of Maryland Francis King Carey School of Law, the Center on Race, Inequality, and the Law at New York University School of Law, Devon Carbado, Rachel D. Godsil, Jerry Kang and L. Song Richardson as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette, Gerald A. Engler, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Dana Muhammad Ali, Jaime L. Fuster, Stacy S. Schwartz and Susan S. Kim, Deputy Attorneys General, and Joshua A. Klein, Deputy State Solicitor General, for Plaintiff and Respondent.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, Karl K. Husoe and Ronald A. Jakob, Deputy District Attorneys, for the San Diego County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

Nathan J. Hochman, District Attorney, John Harlan II and Patrick Frey, Deputy District Attorneys, for the District Attorney of Los Angeles County as Amicus Curiae.

Gregory D. Totten and Philip P. Stemler, Deputy District Attorney (San Bernardino), for the California District Attorneys Association as Amicus Curiae.

Kent S. Scheidegger for the Criminal Justice Legal Foundation as Amicus Curiae.

Dan Dow, District Attorney, and Richard J. Sachs, Deputy District Attorney, for the Office of the District Attorney for the County of San Luis Obispo as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William C. Whaley
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 20000
Oakland, CA 94612
(510) 879-0756